457 Mass. 663 (2010)                                                663

Alliance to Protect Nantucket Sound, Inc. *v.* Energy Facilities Siting Board.

ALLIANCE TO PROTECT NANTUCKET SOUND, INC., & others[1] *vs.*
ENERGY FACILITIES SITING BOARD & others[2,3]
(and a consolidated case[4]).

Suffolk. Barnstable. February 11, 2010. - August 31, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, CORDY, BOTSFORD, & GANTS, JJ.

*Energy Facilities Siting Board. Administrative Law,* Agency's authority, Primary
   jurisdiction, Substantial evidence, Record, Findings, Regulations. *Public
   Utilities,* Electrical transmission line, Electric company. *Trust,* Public trust.
   *Jurisdiction,* Administrative matter. *Electric Company. Municipal Corpora-
   tions,* Electric lines. *Environment,* Environmental impact report. *Depart-
   ment of Environmental Protection.*

This court concluded that G. L. c. 164, § 69K, under which the Energy Facili-
   ties Siting Board (board) issued a certificate of environmental impact and
   public interest granting approval to an electric company to build underground
   and undersea electric transmission cables or lines to connect its proposed
   offshore wind-powered energy generating facility to the regional electric
   power grid, thus overriding the denial by a regional planning commission
   (commission) of the electric company's application for a development of
   regional impact, was not inconsistent with a statute creating the commission,
   where, although the electric company could have appealed the commission's
   denial, the denial also triggered the electric company's independent right
   under § 69K to seek the certificate from the board [672-674]; further, the
   commission qualified as a local agency within the meaning of § 69K
   [674-676].
This court concluded that G. L. c. 164, § 69K, authorized the Energy Facilities

_____

[1]Lindsey Counsell, Susan Nickerson, Hank Walcott, Christy Mihos, Patty
Dineen, Barbara Cambal, Martha Powers, Robert M. Bussiere, Cathleen Bus-
siere, Doris Rodensky, Robert Edgar Bowdoin, Sandy Taylor, Ed Barrett, Ro-
berta Murphy, Theodore Zambellis, Dorothy Robinson, town of Barnstable
(Barnstable), and Cape Cod Commission (commission).

[2]Department of Environmental Protection (DEP) and Cape Wind Associ-
ates, LLC (Cape Wind); Conservation Law Foundation and Clean Power Now,
Inc., interveners.

[3]We acknowledge the amicus briefs filed by the towns of Aquinnah, Edgar-
town, Chilmark, and West Tisbury; the Martha's Vineyard Commission; and
Boston Gas Company, Colonial Gas Company, Essex Gas Company, Mas-
sachusetts Electric Company, Nantucket Electric Company, and New England
Power Company.

[4]Town of Barnstable & another *vs.* Energy Facilities Siting Board (siting
board) & another.

Siting Board (board) to include, in a certificate of environmental impact and public interest granting approval to an electric company to build underground and undersea electric transmission cables or lines to connect its proposed offshore wind-powered energy generating facility to the regional electric power grid, a license relating to the Commonwealth's tidelands, where § 69K is a sufficiently articulated legislative delegation of authority to the board to act in the place of the Department of Environmental Protection (department), which is the agency charged with responsibility for protecting public trust rights in tidelands, and to administer the public trust rights within the department's jurisdiction in the limited context of deciding whether to approve the equivalent of a tidelands license. [676-682] MARSHALL, C.J., dissenting, with whom SPINA, J., joined.

This court concluded that the Energy Facilities Siting Board, in a hearing to determine whether to issue a certificate of environmental impact and public interest to an electric company to build underground and undersea electric transmission cables or lines (transmission lines) to connect its proposed offshore wind-powered energy generating facility (wind farm) to the regional electric power grid, properly determined that it lacked jurisdiction to consider the "in-State" impacts of the wind farm itself, due to its location in Federal waters, where the transmission lines were the only facility subject to the board's review, and where the wind farm itself was within Federal jurisdiction, which is paramount in this area. [682-687] MARSHALL, C.J., dissenting, with whom SPINA, J., joined.

This court declined to consider a claim that a limited liability electric company did not qualify as an "electric company" within the meaning of G. L. c. 169, § 1, where the issue was raised for the first time in a party's reply brief on appeal to this court. [687-688]

In a hearing before the Energy Facilities Siting Board (board) on an electric company's petition for a certificate of environmental impact and public interest to build underground and undersea electric transmission cables or lines (transmission project) to connect the electric company's proposed offshore wind-powered energy generating facility to the regional electric power grid, substantial evidence supported the board's finding that the electric company made a good faith effort to obtain approval from a regional planning commission (commission) for a development of regional impact (DRI) [690-691]; further, the board acted reasonably in denying a motion to limit the record before it to the record that was before the commission during the DRI review process [691]; moreover, the board acted reasonably in relying on findings it had made in earlier decisions on the transmission project regarding the need for the transmission project [692-694], and substantial evidence supported the board's findings with respect to the environmental impact of the transmission project [694-698]; finally, the board fully addressed the "reasonableness of exemption" standard in G. L. c. 164, § 69O (3) [698].

This court concluded that a regulation promulgated by the Department of Environmental Protection (department) regarding water-dependent uses did not violate the department's governing statute, was not violative of the department's responsibilities under the public trust doctrine, and was not arbitrary. [698-701]

CIVIL ACTIONS commenced in the Supreme Judicial Court for the county of Suffolk on June 16 and 22, 2009.

After consolidation, the case was reported by *Botsford*, J.

CIVIL ACTION commenced in the Superior Court Department on April 9, 2008.

Motions to dismiss were heard by *Robert C. Rufo*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Eric W. Wodlinger* (*Gareth I. Orsmond* with him) for Cape Cod Commission.

*Douglas H. Wilkins* (*Nina L. Pickering Cook* with him) for Alliance to Protect Nantucket Sound & others.

*Charles S. McLaughlin, Jr.*, for town of Barnstable.

*Kenneth W. Salinger*, Assistant Attorney General (*Annapurna Balakrishna*, Assistant Attorney General, with him) for Energy Facilities Siting Board & another.

*David S. Rosenzweig* (*Erika J. Hafner* with him) for Cape Wind Associates, LLC.

*Shanna M. Cleveland*, for Conservation Law Foundation, intervener, submitted a brief.

*Matthew F. Pawa* & *Mark R. Rielly*, for Clean Power Now, Inc., intervener, submitted a brief.

The following submitted briefs for amici curiae:

*Ronald H. Rappaport* & *Michael A. Goldsmith* for town of Aquinnah & others.

*Mark J. Lanza* for Martha's Vineyard Commission.

*Patricia Crowe* & *Brooke Skulley* for Boston Gas Company & others.

BOTSFORD, J. In 2005, the Energy Facilities Siting Board (siting board), acting pursuant to G. L. c. 164, § 69J (§ 69J), approved the petition of Cape Wind Associates, LLC (Cape Wind), to build and operate two 115 kilovolt underground and undersea electric transmission cables or lines (transmission project, or transmission lines) that would connect Cape Wind's proposed offshore wind-powered energy generating facility (wind farm) to the regional electric power grid. This court affirmed the siting board's decision. *Alliance to Protect Nantucket Sound, Inc.* v. *Energy Facilities*

*Siting Bd.*, 448 Mass. 45, 56 (2006) (*Alliance I*). Actual construction of the transmission lines, however, requires additional permits, licenses, and approvals from a number of different State and local authorities.

In 2007, the Cape Cod Commission (commission) denied Cape Wind's proposed development of regional impact (DRI); approval of the DRI by the commission was one of the required "approvals" for the transmission project. Soon thereafter, Cape Wind applied to the siting board pursuant to G. L. c. 164, § 69K (§ 69K), for a "certificate of environmental impact and public interest" (certificate, or § 69K certificate) that would constitute a "composite" of the "individual permits, approvals or authorizations which would otherwise be necessary for the construction and operation" of the transmission project. *Id.* After conducting an adjudicatory proceeding, the siting board granted the requested certificate in May, 2009. Three of the interveners in the certificate proceeding appeal from the siting board's decision pursuant to G. L. c. 164, § 69P, and G. L. c. 25, § 5: the Alliance to Protect Nantucket Sound (Alliance), the commission, and the town of Barnstable (Barnstable) (collectively, petitioners). They seek reversal of the decision, and also request that we declare invalid a regulation of the Department of Environmental Protection (DEP). We affirm the decision of the siting board and conclude that the challenged regulation is valid.

*Background.*[5] Cape Wind plans to construct a wind farm consisting of 130 wind turbine generators, each 440 feet tall, on Horseshoe Shoal in Nantucket Sound, a location that is more than three miles from any Commonwealth coast and entirely in Federal waters. As a result, the wind farm itself requires only Federal permits. However, the transmission lines at issue in this case, which Cape Wind proposes to build to connect the wind farm to the regional power grid, will pass under Massachusetts territorial waters in Lewis Bay and Nantucket Sound for approximately six miles and therefore require State and local permits, licenses, and approvals for their construction and operation. The

---

[5]The background information is taken from the administrative record of the siting board's proceeding to consider Cape Wind's petition and application for a "certificate of environmental impact and public interest" (certificate, or § 69K certificate) pursuant to G. L. c. 164, § 69K (§ 69K).

transmission lines — two cables, each comprised of three copper conductors and one fiber optic cable bundled together — will carry electricity across an approximately 18.4 mile route, running under the seabed through Nantucket Sound and Lewis Bay for 12.5 miles, coming ashore in the town of Yarmouth (Yarmouth), and continuing underground for 5.9 miles through Yarmouth and Barnstable to an existing switching station in Barnstable.

Cape Wind's efforts to secure the necessary Federal and, of greater significance here, State and local regulatory approvals for its wind farm and transmission project have a lengthy history. In November, 2001, Cape Wind began to seek the permits required for the transmission project by filing an expanded environmental notification form (ENF) with the Executive Office of Energy and Environmental Affairs (EOEEA). The filing set in motion a joint review by the EOEEA under the Massachusetts Environmental Protection Act (MEPA),[6] and by the commission under § 12 (i) of St. 1989, c. 716, "An Act establishing the Cape Cod commission" (Cape Cod Act). Cape Wind stated in the ENF that it sought a DRI approval from the commission. After holding a public hearing, the Secretary of the EOEEA determined that the transmission project would require Cape Wind to file an environmental impact report (EIR) in order to comply with MEPA, and outlined

---

[6]Review of the petition to build and operate two 115 kilovolt underground and undersea electric transmission cables or lines (transmission project, or transmission lines) under the Massachusetts Environmental Protection Act (MEPA) occurred jointly with Federal review by the Minerals Management Service (MMS) under the National Environmental Policy Act (NEPA). NEPA review covered the offshore wind-powered energy generating facility (wind farm) itself, in addition to the transmission project. MEPA review did not. The Secretary of the Executive Office of Energy and Environmental Affairs (EOEEA) gave this explanation in the final environmental impact report:

"Because MEPA (like the Cape Cod Commission Act) is the product of state law, not federal law, MEPA review (and by extension Cape Cod Commission review) applies only to those portions of the project that are located within Massachusetts, including its territorial waters (generally within three nautical miles of the low water mark of the shore). The proposed [wind farm] is located outside of Massachusetts and, therefore, is not subject to state regulatory requirements. There is one notable exception . . . federal law (pursuant to the Coastal Zone Management Act) specifically delegates review authority over projects in federal waters to the Coastal Zone Management Office of the adjacent coastal state . . . ."

the scope of the joint DRI-EIR review. Pursuant to a memorandum of understanding with the EOEEA, the commission held public hearings and submitted comment letters to provide input for the MEPA review.

In 2002, Cape Wind sought permission from the siting board pursuant to § 69J, to construct the transmission lines.[7,8] "The approval of the [siting] board is required prior to the commencement of construction of any 'facility'[9] . . . in the Commonwealth, and no State agency may issue a construction permit for any such facility unless the petition to construct the facility has already received approval from the [siting] board." *Alliance I*, 448 Mass. at 46-47, citing § 69J. Following a three-year review, the siting board approved construction of the transmission line facility under § 69J in 2005,[10] a decision this court affirmed in 2006. See *id.* at 56.

---

[7]The siting board is "an independent review board established within the department of telecommunications and energy and charged by the Legislature with administering the provisions contained in G. L. c. 164, §§ 69H through 69Q" in order to fulfil its "governing mandate, set forth in § 69H . . . to 'provide a reliable energy supply for the commonwealth with a minimum impact on the environment at the lowest possible cost.' " *Alliance to Protect Nantucket Sound, Inc.* v. *Energy Facilities Siting Bd.*, 448 Mass. 45, 46-47 (2006) (*Alliance I*).

[8]General Laws c. 164, § 69J (§ 69J), states in relevant part: "No applicant shall commence construction of [an electric] facility . . . unless a petition for approval of construction of that facility has been approved by the [siting] board . . . . In addition, no state agency shall issue a construction permit for any such facility unless the petition to construct such facility has been approved by the [siting] board . . . ."

[9]The definition of "[f]acility" in G. L. c. 164, § 69G, includes "a new electric transmission line having a design rating of [sixty-nine] kilovolts or more and which is one mile or more in length on a new transmission corridor."

[10]At the same time that Cape Wind sought § 69J approval in 2002, it also petitioned the Department of Public Utilities (DPU) under G. L. c. 164, § 72 (§ 72), for a determination that the transmission lines were necessary, would serve the public convenience, and were consistent with the public interest. The DPU chairman referred the § 72 petition to the siting board for review, to be consolidated with Cape Wind's § 69J petition. The siting board's presiding officer ultimately bifurcated the petitions because a § 72 decision could not be made until the completion of MEPA review. In May, 2008, the siting board issued its § 72 decision, finding the transmission project necessary and in the public interest and convenience pursuant to § 72, approving minor changes to the transmission project as it had been originally approved in the siting board's § 69J decision in 2005, and granting a three-year extension to begin construction.

In March, 2007, the Secretary of the EOEEA issued a final environmental impact report, finding the transmission project in compliance with MEPA. Cape Wind then renewed its efforts to obtain DRI approval from the commission. In deciding whether to grant such approval under the Cape Cod Act, St. 1989, c. 716, the commission assesses whether a project complies with minimum performance standards (MPS) set forth in its regional policy plan (RPP), a county ordinance enacted under the Barnstable County Home Rule Charter. St. 1988, c. 163.

In its review of Cape Wind's DRI application, the commission first deemed it incomplete for failure to include certain engineering plans and proof of control of the property along the transmission line route. Nevertheless, the commission held three days of public hearings in May, 2007, and after receiving additional information from Cape Wind, found the application complete as of August 3, 2007. The commission closed public hearings on August 8, 2007, triggering, under § 13 (a) of the Cape Cod Act, a sixty-day period for the commission to make a decision, in the absence of which Cape Wind's DRI application would receive constructive approval. The commission held additional public hearings in September, 2007, and sought still more information. At the commission's request, on September 11, 2007, Cape Wind agreed to extend the decision deadline to October 21, 2007, and provided responses to the specific information requests. On October 18, 2007, the commission denied the DRI application "without prejudice" on grounds that Cape Wind had not submitted the full body of information that it had sought and that Cape Wind would not agree to another extension of the decision deadline.[11],[12]

Cape Wind did not appeal from the DRI decision, but in November, 2007, filed an initial petition with the siting board

---

[11]The commission argued before the siting board that its denial of Cape Wind's development of regional impact (DRI) application was procedural only, a denial without prejudice due to lack of information. The siting board rejected this contention, concluding that the commission's decision represented a final denial of the DRI application on its merits. The commission does not challenge this determination before us.

[12]The commission argued before the siting board that it had only denied the DRI approval without prejudice due to lack of information, rather than an affirmative finding of noncompliance with DRI standards. The siting board rejected this contention, and the commission does not raise it here.

to obtain a § 69K certificate.[13] See 980 Code Mass. Regs. § 6.00 (1993). As previously indicated, such a certificate, if issued, serves as "a composite of all individual permits, approvals or authorizations which would otherwise be necessary for the construction and operation of the facility." G. L. c. 164, § 69K. Cape Wind requested that the certificate include the equivalent of the necessary DRI approval by the commission, and eight additional State and local permits. Among the eight was a tidelands license under G. L. c. 91 (c. 91); tidelands licenses are generally within the regulatory jurisdiction of DEP. See c. 91, § 14.[14]

In December, 2007, Cape Wind filed a formal certificate application, which the siting board consolidated with Cape Wind's initial petition. See G. L. c. 164, § 69L; 980 Code Mass. Regs. §§ 6.02, 6.03. The siting board granted intervener status to the five government entities with permits at issue — Barnstable, Yarmouth, DEP, the Executive Office of Transportation and Public Works, and the commission; and to three nonprofit

---

[13]General Laws c. 164, § 69K, states in relevant part: "Any electric, gas or oil company which proposes to construct or operate facilities in the commonwealth may petition the [siting] board for a certificate of environmental impact and public interest with respect to such facility. The [siting] board shall consider such petition providing: . . . the facility cannot be constructed due to any disapprovals, conditions or denials by a state or local agency or body, except with respect to any lands or interests therein, excluding public ways, owned or managed by any state agency or local government."

[14]In October, 2008, Cape Wind filed with DEP an application for a tidelands license pursuant to G. L. c. 91, § 14, and 310 Code Mass. Regs. §§ 9.00 (2008). This replaced and superseded the application Cape Wind had filed with DEP on December 13, 2004. DEP did not act on Cape Wind's 2004 application because the MEPA process had not yet been completed. On December 22, 2008, after public hearing, DEP issued a draft license and written determination that the proposed transmission project satisfied the requirements of G. L. c. 91 (c. 91). DEP found that the project, as infrastructure to be used to deliver electricity from an offshore facility outside the Commonwealth, qualified as a water-dependent industrial use of tidelands under 310 Code Mass. Regs. § 9.12(2)(b)(10). DEP further found that the "project serves a proper public purpose which provides greater public benefit than detriment to the public's rights in said tidelands" and "preserves public rights of access to [the] tidelands for fishing, fowling, navigation and the natural derivatives thereof." DEP conditioned the draft license on receipt of all Federal, State, and local approvals, including State and local permits obtained in the form of a § 69K certificate. On January 9, 2009, the Alliance to Protect Nantucket Sound, Inc. (Alliance), filed a claim for an administrative adjudicatory hearing on the DEP draft license under c. 91, § 18, and 310 Code Mass. Regs. § 9.17. On July 10, 2009, DEP stayed further proceedings pending decision in this case.

organizations — Conservation Law Foundation, Clean Power Now, Inc., and the Alliance. See G. L. c. 164, § 69N.[15] From August through October, 2008, the parties conducted written discovery. Cape Wind, the commission, and DEP each submitted prefiled testimony of witnesses. Also before the siting board were 330 exhibits, consisting mainly of responses to information requests.[16] The siting board's presiding officer held two days of hearings, during which witnesses whose direct testimony had been prefiled were subject to cross-examination. The siting board issued a tentative decision on May 11, 2009, and then a final decision granting the certificate on May 21, 2009.

Each of the petitioners filed an appeal from the siting board's decision in the county court pursuant to G. L. c. 164, § 69P, and G. L. c. 25, § 5. A single justice consolidated the petitioners' appeals, consolidated with them Barnstable's and the commission's appeal in an action Barnstable and the commission had brought against the siting board in the Superior Court,[17] and reserved and reported these appeals to this court, along with stipulations concerning claims for declaratory relief brought by the Alliance and Barnstable.[18] We refer to additional facts from the siting board's administrative record where pertinent to the discussion that follows.

[15]The commission and the Alliance moved to limit the certificate proceeding to the record the commission had considered during its own DRI review. They also moved to dismiss on several grounds. The siting board's presiding officer denied the motions. The presiding officer granted Cape Wind's motion to limit the scope of the certificate proceeding to facilities located within the Commonwealth, that is, the transmission lines, as opposed the wind farm or its in-State impacts. We discuss the issues raised by these various motions *infra*.

[16]The Alliance and Barnstable offered prefiled direct testimony addressing in-State impacts of the wind farm, which the presiding officer excluded pursuant to the earlier ruling with respect to the scope of the certificate proceedings. See note 15, *supra*.

[17]Barnstable and the commission sought declaratory relief under G. L. c. 231A, concerning an alleged conflict between the Cape Cod Act, St. 1989, § 716, and the siting board's enabling statute, G. L. c. 164, §§ 69G-69Q (siting board statute). A Superior Court judge dismissed the complaint for failure to exhaust administrative remedies. Barnstable and the commission appealed, and we granted their application for direct appellate review. See note 4, *supra*. The parties agree that the remaining live issues from the Superior Court action are before this court in the appeal from the siting board decision pursuant to G. L. c. 164, § 69P, and G. L. c. 25, § 5. Accordingly, we do not consider further Barnstable's appeal from the Superior Court judgment in this opinion.

[18]The stipulations were made solely for the purposes of the declaratory

*Discussion.* Each of the petitioners challenges the siting board's decision on several grounds, and the Alliance and Barnstable separately challenge the validity of a DEP regulation relevant to that decision, 310 Code Mass. Regs. § 9.12(2)(b)(10) (2008). We discuss first the challenges that may be described loosely as claims concerning aspects of the siting board's jurisdictional authority in this case; we then review the challenges that go to the validity of the siting board's decision. Finally, we consider the challenge to the DEP regulation.[19]

A. *Jurisdictional authority claims.* 1. *Authority to override a DRI decision by the commission.* The petitioners assert that the siting board had no jurisdiction under § 69K to grant the equivalent of an approval of Cape Wind's DRI, and thereby to override the commission's denial. We consider each of their arguments, and conclude that none has merit.

a. *Cape Cod Act.* Section 17 (*b*) of the Cape Cod Act states that "[a]ny party aggrieved by a commission decision on a [DRI] may appeal the commission's decision to the Barnstable county superior court or the land court"; § 17 (*d*), in turn, provides that "[t]he foregoing remedy shall be exclusive." The petitioners take the position that the Cape Cod Act, enacted in 1989, controls as more specific and more recent legislation than the siting board's enabling statute, G. L. c. 164, §§ 69G-69Q (siting board statute), originally enacted in 1973. Accordingly, in their view, § 17 (*d*) of the Cape Cod Act provides Cape Wind's exclusive avenue to challenge the commission's DRI denial.

---

judgment claims challenging the validity of 310 Code Mass. Regs. § 9.12(2)(b)(10), discussed *infra.* There is no contention of failure to exhaust administrative remedies with respect to this claim.

[19]In the petitions filed in the county court pursuant to G. L. c. 164, § 69P, and G. L. c. 25, § 5, Barnstable and the Alliance had included two counts for declaratory relief, one concerning the DEP regulation and the second relating to whether Federal law preempts State agencies from considering in-State impacts of the wind farm, whether the siting board has the authority to issue the equivalent of a tidelands license under c. 91, and whether the siting board has the authority to override St. 1989, c. 716, the Cape Cod Act. In their briefs, Barnstable and the Alliance have appropriately argued the substance of their second count as challenges to the validity of the siting board's decision and have not made any argument as to why they should be the subject of separate declaratory relief. We consider any claim to that effect waived. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

We presume that the Legislature acts with full knowledge of existing laws. *Suliveres* v. *Commonwealth*, 449 Mass. 112, 116 (2007). *Commonwealth* v. *Callahan*, 440 Mass. 436, 440-441 (2003). Thus, "[w]hen construing two or more statutes together, '[w]e are loath to find that a prior statute has been superseded in whole or in part in the absence of express words to that effect or of clear implication.' *Registrar of Motor Vehicles* v. *Board of Appeal on Motor Vehicle Liab. Policies & Bonds*, [382 Mass. 580, 585 (1981)]. 'The longstanding test for the principle of implied repeal is whether the prior statute is so repugnant to, and inconsistent with, the later enactment that both cannot stand. Only then is the former statute repealed.' *Commonwealth* v. *Graham*, 388 Mass. 115, 125 (1983)." *Dedham Water Co.* v. *Dedham*, 395 Mass. 510, 518 (1985).

Applying these principles here, we find no disabling inconsistency between the siting board statute and the Cape Cod Act. Rather, as the facts of these cases illustrate, the two statutes can be read together, giving meaning and purpose to both.[20] See *Commonwealth* v. *Harris*, 443 Mass. 714, 725 (2005) ("Rather than mechanically applying the concept that the more 'recent' or more 'specific' statute . . . trumps the other, we should endeavor to harmonize the two statutes so that the policies underlying both may be honored"). Under § 69L (A) (4) of the siting board statute, an applicant for a certificate must first try to obtain the necessary regulatory approvals from the relevant permitting agencies. Cape Wind followed this course with respect to its DRI, seeking the commission's approval in the first instance. Accordingly, the commission had the opportunity to review the transmission project under the relevant provisions of the Cape Cod Act and the commission's implementing regulations. When the commission exercised its authority to deny the DRI, the petitioners are correct that Cape Wind could have appealed under § 17 of the Cape Cod Act. However, the denial also triggered Cape Wind's independent right to seek a certificate from the siting board under § 69K,[21] a course that Cape Wind pursued.

[20]For purposes of reviewing the operation of the two statutes together, we assume that the commission qualifies as a "local agency or body" or "local government" as those terms are used in § 69K and G. L. c. 164, § 69L. The correctness of this assumption is considered *infra*.

[21]We refer to the final portion of the second sentence in § 69K's first

And § 69K directs that when the siting board issues a certificate, "[n]otwithstanding the provisions of any other law to the contrary . . . *no* state agency or local government shall impose or enforce any law, ordinance, by-law, rule or regulation nor take any action . . . which would delay or prevent the construction, operation or maintenance of such facility" (emphasis added).

As this review indicates, the two statutes can operate harmoniously together. The fact that § 69K authorizes the siting board to issue a certificate for a particular project that supersedes a commission decision under the Cape Cod Act does not thereby make the statutes inconsistent.[22] The commission's construction of the two statutes would have § 69K, and the siting board statute generally, apply everywhere in the Commonwealth except Barnstable County, a reading inconsistent with the siting board's responsibility "to provide a reliable energy supply *for the commonwealth*" (emphasis added). G. L. c. 164, § 69H. See *City Council of Agawam* v. *Energy Facilities Siting Bd.*, 437 Mass. 821, 828 (2002) (*City Council of Agawam*) ("the intent and purpose of the [siting board] statute . . . is in part to ensure that local boards do not use their power over licenses and permits to thwart the needs of the broader community for a reliable, affordable, and environmentally sound energy supply").[23]

b. *The commission as local agency or body.* The first paragraph

paragraph, which provides that the siting board "shall" consider an electric company's petition for a certificate if "the facility cannot be constructed due to any . . . denials by a state or local agency or body."

[22]The petitioners make much of the fact that the Legislature specified in § 12 (*f*) of the Cape Cod Act that for purposes of comprehensive permits governed by G. L. c. 40B, the commission was to be considered a "local board," but included no similar provision stating that the commission was a "state or local agency or body" for purposes of § 69K; their argument is that if the Legislature had intended to subordinate the commission to the siting board, it would have explicitly so provided. But as the siting board observed, the opposite inference is equally valid: the Legislature could have, but did not, specifically exempt the commission's DRI decisions from the siting board's jurisdiction when it enacted the Cape Cod Act.

[23]The petitioners advance a separate but related argument that the Barnstable Home Rule Charter, St. 1988, c. 163, like the Cape Cod Act, effectively supersedes the siting board statute as a later enacted and more specific statute. Specifically, they claim that § 69K limits the siting board's override authority to "disapprovals, conditions or denials," language that does not extend to the "repeal" of the regional policy plan (RPP), a county ordinance enacted under the Barnstable Home Rule Charter, and "repeal" is what the petitioners state

of § 69K authorizes an electric company to seek a certificate from the siting board if its proposed "facility cannot be constructed due to any disapprovals, conditions or denials by a state or *local agency or body*" (emphasis added); the phrase "local agency or body" is not defined. The section also uses the term "local government," which is defined in G. L. c. 164, § 69G, to mean, "any political subdivision of the commonwealth, including any county, city, town, district agency or regional agency." The Cape Cod Act, in turn, states that the commission "shall be the regional planning agency for Cape Cod" and that it "shall be an agency within the structure of [the] Barnstable county government." St. 1989, c. 716, § 3 (*a*). The petitioners contend that as defined or described in the Cape Cod Act, the commission qualifies as a "local government," but not as a "local agency or body" for purposes of § 69K. Accordingly, they claim, the commission's denial of a DRI cannot properly serve as the basis for a petition to the siting board for a certificate. The argument fails. We agree with the siting board that when one reads § 69K as a whole, it is clear that the Legislature has used the term "local government," "local agency," and "local agency or body" interchangeably.[24] And as we discuss later in connection with

occurred here. We disagree. The siting board's § 69K certificate in effect overruled the commission's denial of Cape Wind's DRI application; there was no "repeal" of the RPP. Nor have the petitioners pointed to any particular provision in the Barnstable Home Rule Charter that they consider to be directly inconsistent with § 69K.

[24]In its original form, the clause of § 69K's first paragraph in question here read: "or the facility cannot be constructed due to any disapprovals, conditions or denials by local governments." G. L. c. 164, § 69K, inserted by St. 1973, c. 1232, § 1. In 1976, the term "local governments" was replaced by the phrase "a state or local agency or body." G. L. c. 164, § 69K, as amended through St. 1976, c. 468, § 6. The parties have not referred us to any legislative history, and we have found none, that appears to shed direct light on this change. Nonetheless, it is reasonable to assume from the language itself that its purpose was principally to add the word "State" to the phrase, and that the Legislature then substituted "agency or body" for "governments" in the phrase "a state or local agency or body" to reflect that *State* agencies or bodies were now included. Our understanding is supported by the fact that throughout § 69K in its original form, see St. 1973, c. 1232, § 1, and currently, the Legislature has consistently referred to permits of State and local agencies or local governments as a group (see § 69K, first, second, and fourth pars.), suggesting that the 1976 amendment was an attempt to correct this one nonconforming reference to "local governments" only.

another provision in § 69K, the siting board's interpretation is entitled to respect and deference. See *City Council of Agawam*, 437 Mass. at 828. Moreover, the commission is defined in § 3 (*a*) of the Cape Cod Act as a "regional" agency within the structure of "county government." As such, the commission is clearly a local (as opposed to State) agency, and therefore it qualifies as a "local agency or body" within the meaning of § 69K in any event.

2. *Authority to include the equivalent of a c. 91 tidelands license in a § 69K certificate.* The Alliance, joined by Barnstable, claims that § 69K does not authorize the siting board to include in a certificate granted under that section any type of license relating to the Commonwealth's tidelands.[25] The argument is that these tidelands are both owned and held in trust by the Commonwealth to protect the public's rights in them, and that no one — including a State agency such as the siting board — may claim authority to act in connection with the tidelands unless granted express legislative authority to do so. The Alliance contends that § 69K contains no language of delegation or even mention of the tidelands or the public trust with which they are imbued, and therefore, the siting board cannot grant a certificate that incorporates, in effect, a c. 91 tidelands license.

The public trust doctrine expresses the government's longstanding and firmly established obligation to protect the public's interest in the tidelands and, in particular, to protect the public's right to use the tidelands "for, traditionally, fishing, fowling, and navigation." *Moot* v. *Department of Envtl. Protection*, 448 Mass. 340, 342 (2007) (*Moot I*). See *Trio Algarvio, Inc.* v. *Commissioner of the Dep't of Envtl. Protection*, 440 Mass. 94,

---

[25]Tidelands are a "broad but single category of the estuarine complex comprising the shore and submerged lands lying between mean high water and the seaward boundary of the Commonwealth." Final Report: A Study of the Law Pertaining to the Tidelands of Massachusetts, 1971 House Doc. No. 4932, at 15. Chapter 91, § 1, defines "[t]idelands" as "present and former submerged lands and tidal flats lying below the mean high water mark." The section further separates "[t]idelands" into "Commonwealth tidelands" and "[p]rivate tidelands." "Commonwealth tidelands" are defined as "tidelands held by the commonwealth in trust for the benefit of the public or held by another party by license or grant of the commonwealth subject to an express or implied condition subsequent that it be used for a public purpose." G. L. c. 91, § 1. The portions of Lewis Bay and Nantucket Sound within the Commonwealth's territorial jurisdiction are Commonwealth tidelands.

97 (2003); *Fafard* v. *Conservation Comm'n of Barnstable*, 432 Mass. 194, 198 (2000) (*Fafard*); *Boston Waterfront Dev. Corp.* v. *Commonwealth*, 378 Mass. 629, 632 (1979). There is no question that the Commonwealth tidelands through which Cape Wind's transmission lines will pass are held in the public trust to which the Alliance refers. We also agree with the Alliance that under the public trust doctrine, "only the Commonwealth, or an entity to which the Legislature properly has delegated authority, may administer public trust rights." *Fafard, supra* at 199. See *id.* at 196. See also *Commonwealth* v. *Charlestown*, 1 Pick. 180, 184-185 (1822). The question, then, is whether the Legislature in § 69K "properly has delegated authority," *Fafard, supra* at 199, to the siting board to exercise public trust rights. The answer requires examination of c. 91, the waterways statute administered by DEP, § 69K, and the statutory scheme of which § 69K is a part.

The Legislature has delegated to DEP the authority to license "structures" in the Commonwealth's tidelands, provided that they "serve a proper public purpose and that said purpose shall provide a greater public benefit than public detriment to the rights of the public in said lands." G. L. c. 91, § 14. See *id.* at § 18. In doing so, DEP is to "protect the interests of the Commonwealth" in the tidelands. *Id.* at § 2. Section 69K, in turn, grants authority to the siting board to issue a certificate in accordance with §§ 69K-69O, which

> "shall be in the form of a composite of *all* individual permits, approvals or authorizations which would otherwise be necessary for the construction and operation of the facility[26] and that portion of the certificate which relates to subject matters within the jurisdiction of a state or local agency shall be enforced by said agency under the applicable laws of the commonwealth as if it had been directly granted by the said agency" (emphasis added).

---

[26]There is overlap between the definition of the term "facility" as it is used in § 69K (see G. L. c. 164, § 69G, which sets out the definition, quoted in note 9, *supra*); and "structure" as used in c. 91, § 14 (see c. 91, § 1, which defines the term). The transmission lines that Cape Wind seeks to construct qualify both as a "facility" for purposes of § 69K and as a "structure" under c. 91, §§ 14 and 18.

We read the quoted provision in § 69K as an express legislative directive to the siting board to stand in the shoes of any and all State and local agencies with permitting authority over a proposed "facility" — that is, a directive to assume all the powers and obligations of such an agency with respect to the decision whether to grant the authorization that is within the agency's jurisdiction, with regulatory enforcement thereafter returned to that agency. DEP, as a State agency, is by definition included within the broad coverage of § 69K. There is no mention of public trust rights or obligations in § 69K, but there does not need to be. The Legislature has designated DEP as the agency charged with responsibility for protecting public trust rights in tidelands through the c. 91 licensing program, and where a tidelands license is necessary for a proposed facility, the Legislature has, in § 69K, expressly vested authority in the siting board to act in DEP's stead with respect to the initial permitting decision. Accordingly, an evaluation of § 69K's relationship to the public trust doctrine must take into account the fact that in a case such as this, § 69K operates as an overlay of c. 91.

Other sections of the siting board statute support our reading of § 69K, most significantly, G. L. c. 164, § 69O (§ 69O). That section specifies the issues on which the siting board must make findings in its decision whether or not to grant a § 69K certificate, and provides that the siting board must take into account whether the facility seeking the certificate will conform to the various laws, ordinances, and regulations that would otherwise govern it in the absence of a § 69K certificate. G. L. c. 164, § 69O (3). See note 36, *infra*, where § 69O is quoted in full. One set of such laws is c. 91, §§ 2, 14 and 18, with their requirement that DEP protect the public's interest in tidelands in issuing any license or permit pursuant to c. 91. Because § 69K delegates to the siting board both the power *and the obligation* to stand in the shoes of DEP, if DEP had not made the findings that the siting board adopted here,[27] the siting board would have had to undertake the same reviewing process that

---

[27] As previously discussed, Cape Wind initially sought a c. 91 license directly from DEP, and in December, 2008, DEP issued a draft license and written determination that the transmission project met the requirements of c. 91. See note 14, *supra*. The siting board incorporated DEP's findings into its certificate

DEP did in evaluating Cape Wind's c. 91 tidelands license application.[28]

In sum, we find in § 69K a sufficiently articulated legislative delegation of authority to the siting board to act in the place of DEP, and to administer the public trust rights within DEP's jurisdiction in the limited context of deciding whether to approve the equivalent of a c. 91 tidelands license.[29] Contrast

decision and included the equivalent of a tidelands license in the certificate it granted. DEP expressly stated that it had no objection.

[28]General Laws c. 164, § 69O (3), authorizes the siting board in certain instances to issue a § 69K certificate that would not require the certificate holder to conform fully "with existing state and local laws, ordinances, by-laws, rules and regulations." See note 36, *infra*. The Commonwealth's public trust obligations exist independently of such State and local laws and other regulatory measures. See *Moot* v. *Department of Envtl. Protection*, 448 Mass. 340, 347 (2007) (*Moot I*), citing *Fafard* v. *Conservation Comm'n of Barnstable*, 432 Mass. 194, 200 n.11 (2000) (*Fafard*) ("the Commonwealth's authority and obligations under [G. L. c. 91] are not precisely coextensive with its authority and obligations under the public trust doctrine"). We do not read § 69O (3) as a delegation of authority to the siting board effectively to exempt a facility from otherwise applicable requirements of the public trust doctrine. Rather, in any case where public trust obligations are in play because a c. 91 tidelands license is at issue, those obligations must be fully met by the applicant seeking a certificate in the absence of further legislative action. Cf. *Moot I, supra* at 350, 352-353 (under public trust doctrine, DEP could not, without specific legislative authorization, adopt regulation exempting filled landlocked tidelands from c. 91's licensing requirements). Cf. also *Arno* v. *Commonwealth*, *ante* 434, 453 n.21 (2010) (land registration proceedings concerning plaintiff's parcel of filled tidelands could not have effect of relinquishing public trust rights in that parcel absent specific legislative authorization).

[29]While not directly bearing on the delegation question discussed in the text, additional sections of the siting board statute reflect the Legislature's interest in having DEP, the agency to which the Legislature generally has granted authority to issue such licenses, play a role in the siting board's decision where a c. 91 tidelands license is in issue. Thus, G. L. c. 164, §§ 69L and 69N, read together, define the "parties in interest" in any certificate proceeding to include, among others, any person or entity that the siting board permits to intervene. In the present case, DEP was an intervener in the § 69K proceeding concerning Cape Wind, and fully participated in that proceeding. Moreover, in G. L. c. 164, § 69H, as amended through St. 2007, c. 19, § 37, the Legislature has designated the Secretary of EOEEA, the Executive Office in which DEP resides, as the chair of the siting board itself, and the commissioner of DEP as one of the siting board's nine members. We view these provisions as steps taken by the Legislature to facilitate the siting board's obligation to address DEP's statutory and regulatory mandate — including the protection of public trust rights — when, as in this case, they are implicated by a § 69K certificate application.

*Fafard*, 432 Mass. at 198-199, 207 (where there was *no* grant of authority by Legislature, local conservation commission could not exercise public trust rights, and bylaw purporting to do so was invalid). Contrast also *Moot I*, 448 Mass. at 347-353.[30] Accordingly, the siting board in this case did not exceed its

---

[30]In *Moot I*, 448 Mass. at 347, 352-353, we held that DEP exceeded its authority under G. L. c. 91, § 18, by promulgating a regulation exempting filled landlocked tidelands from c. 91's licensing requirements. "By exempting filled 'landlocked' tidelands from the statute's licensing requirements, [DEP was] relinquishing all control over the use of the filled land . . . without legislative authorization, effectively relinquishing all public rights that the Legislature has mandated be preserved through the licensing requirements." *Id.* at 350. See *Moot* v. *Department of Envtl. Protection*, 456 Mass. 309, 310 (2010) (*Moot II*). Here, there has been no relinquishment or extinguishment of the public's rights in the tidelands at issue.

We agree with the Chief Justice, see *post* at 703, that an express statement from the Legislature is necessary both to relinquish public rights in tidelands and to delegate authority to administer public trust rights and duties. See, e.g., *Arno* v. *Commonwealth*, *supra* at 438 n.7, 453 n.21. The decisions of this court, however, have recognized a difference between a legislative delegation of authority to administer public trust rights and duties through regulation or use of tidelands subject to conditions, and a permanent relinquishment of the public's rights in tidelands. The latter can only happen where the Legislature has undertaken specific steps and made explicit findings to signal its intent to relinquish. Compare *Fafard*, 432 Mass. at 199 n.10 ("The Commonwealth may delegate, and has delegated, its authority to preserve and regulate Commonwealth tidelands to State agencies or municipalities"), and *Boston Waterfront Dev. Corp.* v. *Commonwealth*, 378 Mass. 629, 649 (1979) (wharfing statutes granting landowners fee simple title to certain Commonwealth tidelands "subject to the condition subsequent that it be used for the public purpose for which it was granted"), with *Opinions of the Justices*, 383 Mass. 895, 901-905 (1981) (setting forth steps Legislature must take to "abandon, release, or extinguish the public interest in submerged land" and noting that "*Boston Waterfront* . . . concerned the consequences of the Lewis Wharf statutes, . . . which did not undertake by their express terms to transfer all the Commonwealth's or the public's interests in the disputed land"). Cf. *Moot II*, *supra* at 313-315 (legislation enacted after *Moot I* did not relinquish public rights in landlocked tidelands but permissibly exempted them from c. 91 licensing scheme; court therefore rejected plaintiffs' claim that legislation exceeded Legislature's authority by effectively extinguishing public trust rights without explicit findings required by *Opinions of the Justices*, *supra*). While it is clear from our case law what steps the Legislature must take to relinquish the public's rights in tidelands, see *Opinions of the Justices*, *supra*, our cases addressing delegation of authority to regulate tidelands, and in doing so to administer public trust rights and duties, have said only that such delegation must be express. See *Commonwealth* v. *Charlestown*, 1 Pick. 180, 184-185 (1822). And the statutory provisions effecting this type of delegation have generally been broadly phrased, offering few specific directives to the designated

authority by including the equivalent of a c. 91 tidelands license in the certificate it granted Cape Wind.

In reaching this conclusion, we also reject the alternative argument advanced by the Alliance that focuses on the following language in the final clause of § 69K's first paragraph:

> "The [siting] board shall consider [a] petition providing: . . . the facility cannot be constructed due to any disapprovals, conditions or denials by a state or local agency or body, *except with respect to any lands or interests therein, excluding public ways, owned or managed by any state agency or local government*" (emphasis added).

According to the Alliance, the quoted "except" clause means that the siting board has no power whatsoever to take action with respect to a license or permit that an agency has disapproved, conditioned or denied if that license or permit pertains to "public" lands — that is, lands owned or managed by any State or local agency — including tidelands managed by DEP under c. 91. The siting board considered but disagreed with the Alliance's argument, concluding:

> "Read in context, the ['except' clause] in [the first paragraph of § ] 69K means that a petitioner may not rely upon a state agency or local government refusal with respect to public lands as a basis to file an *initial petition*. However, this language does not govern the *scope* of the Certificate, which is addressed in the [fifth] paragraph of [§ ] 69K, and which states that a Certificate takes the place of 'all' state or local permits" (emphasis in original).

We accord substantial discretion to an agency to interpret the statute it is charged with enforcing, especially where, as here, see § 69H (1), the Legislature has authorized the agency to promulgate regulations. *City Council of Agawam*, 437 Mass. at 828. See *Middleborough* v. *Housing Appeals Comm.*, 449 Mass.

---

agency or official on how to exercise the authority given them. See *Fafard, supra,* and statutes cited. As we have discussed, our view is that in § 69K, the Legislature has expressly delegated to the siting board the authority to grant a revocable c. 91 license to use the tidelands at issue, and encompassed in that delegation is the authority, and obligation, to administer public trust rights and duties.

514, 523 (2007) (*Middleborough*). The siting board's interpretation of the "except" clause treats it as limiting only the types of permit denials that can serve as a basis for a company to petition for a § 69K certificate, but not as a limitation on the siting board's authority to review and potentially override that permit denial, if the company has an independent basis on which to file a certificate petition. As the siting board stated, the structure of § 69K supports this interpretation. The first paragraph of the section in which the "except" clause appears is devoted to listing the specific alternative bases that would justify the filing of a certificate petition, but does not discuss the scope or contents of the certificate itself. The fifth paragraph, however, does focus on contents, and describes the certificate as a "composite of all individual permits" otherwise required. While the meaning of the "except" clause is not entirely clear, the siting board's construction is reasonable, and we defer to it. See *Alliance I*, 448 Mass. at 50-51 n.6 ("the substantial deference owed to an agency's interpretation of a statute it is charged to enforce includes approving an interpretation of statutory language that may be read in two ways"). See also *Middleborough*, 449 Mass. at 523, and cases cited ("Where the statutory language is not without ambiguity . . . , our deference to the agency's interpretation of the governing statute is highest"). Accordingly, we conclude that the except clause did not prohibit the siting board from considering and acting on Cape Wind's request for the equivalent of a c. 91 tideland license.

3. *Jurisdiction to consider "in-State impacts" of the wind farm.* In its decision, the siting board adopted the presiding officer's determination that it lacked jurisdiction to consider the "in-State impacts" of the wind farm itself due to the location of the wind farm in Federal waters, and therefore that the scope of the certificate proceeding would be limited to the transmission lines only and evidence concerning the wind farms's impacts would be excluded. See note 14, *supra*. The petitioners assert that no such jurisdictional limitation exists, and the siting board was obliged to assess the in-State impacts of the entire wind farm project in making its § 69K certificate decision.[31]

There is no dispute that the wind farm, located entirely in

---

[31]The petitioners mention, in particular, impacts of the wind farm's turbine generators on "state waters, air space, lands, and public safety," alleging that

Federal waters, will lie outside the jurisdiction of the siting board as well as the State and local permitting agencies with permits at issue in the siting board's § 69K proceeding. See *Alliance I*, 448 Mass. at 48 ("The area in which the wind farm itself is proposed to be built is located in Federal waters and, thus, falls beyond the scope of the [siting] board's jurisdiction"). The petitioners assert, however, that whether as a matter of making the findings required by § 69O or of complying with public trust doctrine obligations, the siting board had the power and the duty to consider the potential effects of the wind farm on the Commonwealth. The thrust of their claim appears to be that as a general tenet of environmental and perhaps all regulation of private development projects, regulatory agencies consider — and must consider — all direct and indirect impacts of the entire project; and because Cape Wind's transmission lines will connect directly to and service the wind farm, evaluation of the impacts of the wind farm itself was a mandatory part of the siting board's review of the transmission project. The claim fails for two reasons.

First, the siting board statute generally, and §§ 69J, 69K, and 69O in particular, state with unmistakable clarity that the siting board's regulatory point of focus at all times is to be on the proposed "facility." The petitioners do not, and could not, dispute that Cape Wind's two new 115 kilovolt electric transmission lines constitute the only "facility" subject to the siting board's review in this case. Accordingly, insofar as § 69O (2) directs the siting board to make findings relating to "considerations of environmental protection, public health and public safety," those findings are solely to concern "the compatibility of *the facility*" with such considerations (emphasis added).[32] Cf. *Villages Dev. Co.* v. *Secretary of the Executive Office of Envtl.*

the wind farm will cause harm to navigation, aviation, fisheries, birds, and water quality, as well as create an increased set of risks relating to public safety and environmental damage that a town such as Barnstable will be forced to confront.

[32]This point is reinforced by the fact that since the passage of the 1997 Restructuring Act, St. 1997, c. 164, which amended the siting board statute in several respects, the Legislature has mandated that a proposed "generating facility" (a term that describes the wind farm) be reviewed by the siting board separately from a "facility" (the term that describes the transmission lines). See, e.g., G. L. c. 164, §§ 69J1/4, 69K1/2, 69L1/2, 69O1/2, inserted by St. 1997, c. 164, §§ 210, 214, 216, and 223, respectively.

*Affairs*, 410 Mass. 100, 112-115 & n.13 (1991) (where Secretary of [then] EOEA had jurisdiction under MEPA to review private development project based on one necessary State "permit" [grant of easement over bicycle path to construct bridge], MEPA review statutorily restricted to direct and indirect environmental impacts related to easement itself, not impacts of entire development project, even if bridge necessary for entire project to go forward).

The second reason the petitioners' bid for review of the wind farm's impacts fails is the one the siting board cites: the wind farm itself will be within Federal jurisdiction, and Federal jurisdiction in this area is paramount. See *United States* v. *Maine*, 420 U.S. 515, 522, 524 (1975) ("control and disposition [of all lands underlying sea] in the first instance are the business of the Federal Government rather than the States"; "paramount rights to the offshore seabed inhere in the Federal Government as an incident of national sovereignty"); *Ten Taxpayer Citizens Group* v. *Cape Wind Assocs., LLC*, 373 F.3d 183, 196-197 (1st Cir. 2004), cert. denied, 543 U.S. 1121 (2005) (*Ten Taxpayer Citizens*) (by enacting Outer Continental Shelf Lands Act of 1953 [OCSLA], 43 U.S.C. §§ 1331 et seq., "Congress retained for the federal government the exclusive power to authorize or prohibit specific uses of the seabed beyond three miles from shore"); *Alliance to Protect Nantucket Sound, Inc.* v. *Department of the Army*, 398 F.3d 105, 107-108 (1st Cir. 2005).[33] Contrary to the Alliance's claim, the express assertion of exclusive Federal power and control over the outer continental shelf (defined in OCSLA as all submerged lands lying in navigable

---

[33]Despite the fact that our public trust doctrine relating to, inter alia, Commonwealth tidelands is "an age-old concept with ancient roots," *Trio Algarvio, Inc.* v. *Commissioner of the Dep't of Envtl. Protection*, 440 Mass. 94, 97 (2003), the United States Supreme Court has made it clear "that the United States enjoys exclusive title in the lands underlying the sea [below the low water mark], regardless of a state's historical claims to the waters off its coast." *Ten Taxpayer Citizens Group* v. *Cape Wind Assoc., LLC*, 373 F.3d 183, 188 (1st Cir. 2004), cert. denied, 543 U.S. 1121 (2005), citing *United States* v. *California*, 332 U.S. 19, 29-39 (1947); *United States* v. *Louisiana*, 339 U.S. 699, 705-706 (1950); *United States* v. *Texas*, 339 U.S. 707, 719-720 (1950); and *United States* v. *Maine*, 420 U.S. 515, 522 (1975). Massachusetts, like all other coastal States, has title to the three-mile margin of seabed off its coast only because, in 1953, Congress passed the Submerged Lands Act of 1953, 43 U.S.C. §§ 1301 et seq. (2006), which granted this right.

waters beyond three miles from shore, see 43 U.S.C. § 1331[a]), serves to preempt any attempt by the Commonwealth or its agencies to regulate structures or facilities placed in that area. See *Ten Taxpayer Citizens, supra* at 197 ("If adopted and enforced on the outer Continental Shelf, statutes like [c.] 91 . . . which require[s] the approval of state agencies prior to construction, would effectively grant state governments a veto power over the disposition of the national seabed," a result "fundamentally inconsistent with the OSCLA").

If the siting board were to assert authority to consider the impacts of the wind farm itself, as the petitioners argue that it should, presumably that authority would encompass the power to deny or condition Cape Wind's requested certificate on account of such impacts. But a denial of the certificate on that ground, or even conditioning, would be tantamount to a denial of the wind farm project itself, because, as the siting board found in its § 69J decision approving construction of the transmission project in 2005, the transmission lines are necessary for the wind farm's operation. See *Alliance I*, 448 Mass. at 49-50, 55-56. The siting board does not have authority to do indirectly what it cannot do directly. See *Ten Taxpayer Citizens, supra*. Cf. *New England Legal Found.* v. *Massachusetts Port Auth.*, 883 F.2d 157, 174 (1st Cir. 1989) (holding defendant authority's landing fee regulations invalid under Federal law; fee regulations "appear to be an attempt to modify conduct [e.g., control air traffic] rather than to recover operational cost, and are thus an incursion into an area of regulation preempted by [Federal law]. [The authority] cannot do indirectly what it is forbidden to do directly"). Contrast *Leisure Time Cruise Corp.* v. *Barnstable*, 62 F. Supp. 2d 202, 208-209 (D. Mass. 1999) (where local and regional authorities sought to regulate aspects of actual docking of plaintiff's boat in Hyannis Harbor, this regulation was "ancillary to Leisure Time's operation of its gambling cruise" in Federal waters, and not preempted under applicable Federal law). Contrast also *North Landers Corp.* v. *Planning Bd. of Falmouth*, 382 Mass. 432, 436-438 (1981) (language of subdivision control statute, G. L. c. 41, § 81M, was clear in authorizing planning board to evaluate adequacy of public way outside proposed subdivision in ruling on subdivision plan); *Dupont* v. *Dracut*, 41 Mass. App. Ct. 293, 295 (1996) (under established principles of zoning law, defendant town of Dracut

could prohibit plaintiff from using portion of single lot located partly in Dracut and partly in Lowell for use not permitted in Dracut zoning district but permitted in Lowell: "Whether in the same or two different municipalities, if a lot is located in two different zoning districts, a town may prohibit the portion in one district from being used for an accessory use to serve a principal use not allowed in that district").[34]

We emphasize that the siting board properly could, and did, consider the in-State impacts of the entire length of Cape Wind's transmission lines even though the lines will lie in part in Federal waters because those impacts relate *directly* to the "facility" over which the siting board has jurisdiction. See *Leisure Time Cruise Corp.* v. *Barnstable, supra.* In doing so, the siting board met its public trust obligations arising from the fact that the facility under review is located in Commonwealth tidelands. Here, the siting board, through the presiding officer, allowed the testimony of the petitioners' witnesses so far as it pertained to the transmission project; the testimony deemed inadmissible related solely to the claimed impacts of the wind farm's turbines. See note 16, *supra.* The siting board's presiding officer did not abuse her discretion or commit other error of law by ruling that evidence related to general in-State impacts of the wind turbines, unconnected to the transmission project, was inadmissible.

The wind farm, including its in-State impacts, has undergone extensive scrutiny by Federal and State agencies. In addition to the National Environmental Policy Act review by the Minerals Management Service, see note 6, *supra,* the Coastal Zone Management Office (CZM) has certified to Federal permitting authorities that Cape Wind's entire project, including the wind farm, will be consistent with CZM policies.[35] Moreover, the siting board has conditioned the certificate it granted Cape Wind

---

[34]The legislative history of the siting board statute indicates an early recognition of the limits Federal law places on the scope of the siting board's authority. The Legislature enacted the siting board statute in 1973. St. 1973, c. 1232. The following year, it amended a savings clause in the 1973 statute, see *id.* at § 6, to include the following language: "This act shall not apply to any matter over which any agency, department, or instrumentality of the federal government has exclusive jurisdiction." St. 1974, c. 852, § 21. The Legislature reiterated this limitation in St. 1992, c. 141, § 54.

[35]A Federal statute expressly provides for review and comment on Federal permitting decisions relating to a project that affects use of land, water, or

for the transmission project on Cape Wind's receipt of all necessary Federal and State permits for the wind farm. In reviewing the siting board's decision under § 69J to authorize Cape Wind's construction of the transmission lines, this court approved of the siting board's determination that it was required to defer to Federal review. See *Alliance I,* 448 Mass. at 53-54. We do so again here.

4. *Cape Wind's organizational status.* Section 69K provides that "[a]ny electric . . . company which proposes to construct or operate facilities in the commonwealth may petition the siting board for a certificate." The term "electric company" is defined in G. L. c. 164, § 1, as "a corporation organized under the laws of the commonwealth for the purpose of making . . . selling, transmitting, distributing, transmitting and selling, or distributing and selling, electricity within the commonwealth." The commission argues that because a limited liability company is not a corporation, see G. L. c. 156C, § 2 (5); *CFM Buckley/North, LLC* v. *Assessors of Greenfield,* 453 Mass. 404, 407 (2009), Cape Wind does not qualify as an electric company as defined by § 1, and, thus, the siting board had no jurisdiction to entertain its certificate petition under § 69K. While questions of subject matter jurisdiction may be raised at any time, *Commonwealth* v. *DeJesus,* 440 Mass. 147, 151 (2003); *Litton Business Sys., Inc.* v. *Commissioner of Revenue,* 383 Mass. 619, 622 (1981), the commission has waived the issue by failing to raise it before the siting board. "The question at the heart of subject matter jurisdiction is, 'Has the Legislature empowered the [agency] to hear cases of a certain genre?' " *Doe, Sex Offender Registry Bd. No. 3974* v. *Sex Offender Registry Bd., ante* 53, 56-57 (2010) (*Doe No. 3974*), quoting *Wachovia Bank, Nat'l Ass'n* v. *Schmidt,* 546 U.S. 303, 316 (2006). See *Middleborough,* 449 Mass. at 520, quoting Black's Law Dictionary 870 (8th ed. 2004) ("Subject matter jurisdiction is 'jurisdiction over the nature of the case and the type of relief sought' "). The Legislature has designated the siting board as the administrative authority empowered to hear and grant petitions for certificates or composite

natural resources of a State's coastal zone. See 16 U.S.C. § 1456(c)(3)(A) (2006). In the Commonwealth, the Coastal Zone Management Office (CZM) conducts the review authorized by this statute.

permits sought by entities who claim that actions by other permitting agencies are preventing or delaying their ability to move forward with energy projects. Whether a petitioning entity has a permissible organizational form is not a question of siting board subject matter jurisdiction but one that concerns a substantive element of the entity's prima facie case for relief. See *Middleborough, supra* at 520-521. See also *Doe No. 3974, supra* at 57. Cf. *Arbaugh* v. *Y & H Corp.*, 546 U.S. 500, 516 (2006) (employer discrimination case under Title VII of Civil Rights Act of 1964; after judgment entered in plaintiff's favor, employer moved to dismiss for want of Federal subject matter jurisdiction, asserting for first time insufficient number of employees to be subject to Act; court rejected argument: "the threshold number of employees for application of Title VII is an element of a plaintiff's claim for relief, not a jurisdictional issue"). Because the commission failed to raise the claim before the siting board — or indeed, at any point before its reply brief on appeal to this court, see *Assessors of Boston* v. *Ogden Suffolk Downs, Inc.*, 398 Mass. 604, 608 n.3 (1986) — it is waived.

B. *Certificate decision.* We turn from issues regarding the scope of the siting board's § 69K certificate authority to the substance of its certificate decision. In that decision, the siting board found that Cape Wind satisfied the requirements set forth in § 69O[36] by showing that the transmission project was (1) needed; (2) compatible with considerations of environmental

---

[36]General Laws c. 164, § 69O, states, in relevant part:

"The [siting] board shall make its decision [on a petition for a certificate] in writing and shall include therein its findings and opinions with respect to the following:

"(1) the need for the facility to meet the energy requirements of the applicant's market area taking into account wholesale bulk power or gas sales or purchases or other co-operative arrangements with other utilities and energy policies as adopted by the commonwealth;

"(2) the compatibility of the facility with considerations of environmental protection, public health and public safety;

"(3) [t]he extent to which construction and operation of the facility will fail to conform with existing state and local laws, ordinances, bylaws, rules and regulations and reasonableness of exemption thereunder, if any, consistent with the implementation of the energy policies con-

protection, public health, and safety; (3) in conformance with State and local laws, except for limited aspects of the Cape Cod Act and the RPP, exemption from which was reasonable and consistent with the siting board's statutory mandate to provide a reliable energy supply with a minimum impact on the environment at the lowest possible cost; and (4) required to serve the public interest and convenience. The siting board also found that Cape Wind had complied with G. L. c. 164, § 69L (A) (4),[37] by making a good faith effort to obtain the authorizations included in the certificate: the DRI approval, four local permits Cape Wind could not obtain without DRI approval,[38] and four State authorizations, three of which Cape Wind had already received.[39]

> tained in this chapter to provide a necessary energy supply for the commonwealth with a minimum impact on the environment at the lowest possible cost; and
>
> "(4) the public interest, convenience and necessity requiring construction and operation of the facility."

[37]General Laws c. 164, § 69L (A), states, in relevant part:

> "[A]n applicant for a certificate shall file with the [siting] board a petition . . . containing . . . : (4) A statement setting forth the need of the applicant for the certificate, which . . . shall include . . . a representation as to the good faith effort made by the applicant to obtain from state agencies and local governments the licenses, permits and other regulatory approvals required by law for construction or operation of the facility . . . ."

[38]Without DRI approval, Cape Wind could not obtain wetlands orders of conditions from the conservation commissions of Barnstable and Yarmouth, or road opening permits from each of those towns' departments of public works. The siting board found it "appropriate to avoid further permitting delay by including the otherwise unobtainable local permits in [the] Certificate, as opposed to requiring [Cape Wind] to undertake an entire de novo permitting process" after receiving the certificate, noting that it had comprehensively reviewed and approved the project three times in seven years and that the relevant local permitting entities had participated actively in the certificate proceedings.

[39]The certificate, as previously discussed, incorporated DEP's written determination that Cape Wind satisfied the requirements for a c. 91 license. The certificate also included a so-called § 401 certification that DEP had issued pursuant to § 401 of the Federal Clean Water Act, 33 U.S.C. §§ 1251 et seq. (2006), and the Massachusetts Clean Waters Act, G. L. c. 21, §§ 26 et seq.; a highway access permit that the Massachusetts Highway Department had issued; and a license for use and occupancy authorizing the crossing of a rail line that the Executive Office of Transportation and Public Works had issued.

1. *Standard of review.* The petitioners attack the substance of the certificate decision on multiple grounds. Our standard of review is defined in G. L. c. 164, § 69P, and pursuant to that section, we review each claim to determine whether the siting board's decision

> "is in conformity with the constitution of the commonwealth and the constitution of the United States, was made in accordance with the procedures established under [G. L. c. 164, §§ 69H-69O,] and with the rules and regulations of the [siting] board with respect to such provisions, was supported by substantial evidence of record in the [siting] board's proceedings; and was [not] arbitrary, capricious or an abuse of the [siting] board's discretion under the provisions of [§§ 69H-69O]."

"Consistent with well-established principles of administrative law, we give great deference to the [siting] board's expertise and experience." *Alliance I,* 448 Mass. at 51. Our "review does not turn on whether, faced with the same set of facts, we would have drawn the same conclusion as [the siting board], but only 'whether a contrary conclusion is not merely a possible but a necessary inference.' " *Goldberg* v. *Board of Health of Granby,* 444 Mass. 627, 638 (2005), quoting *Commissioner of Revenue* v. *Houghton Mifflin Co.,* 423 Mass. 42, 43 (1996). The petitioners bear the "burden of proving that the decision is invalid, and that burden is a heavy one." *Alliance I, supra,* citing G. L. c. 25, § 5.

2. *Good faith effort.* First, the commission claims that Cape Wind did not make a good faith effort to obtain DRI approval and, thus, the siting board did not make its certificate decision in accordance with G. L. c. 164, § 69L (A) (4) (quoted in note 37, *supra*). The commission contends that Cape Wind did not establish good faith because it delayed the production of any evidence concerning site control until shortly before the commission's statutory deadline to close the public hearing, and then it agreed only to a two-week extension of the commission's deadline to make a DRI decision. The siting board rejected this argument, finding that Cape Wind did provide "sufficient information to the Commission . . . to constitute a good faith effort." The record

reflects that Cape Wind participated in commission meetings and hearings, responded to specific requests for information, and provided the commission with the "proof of ownership, proprietary interest or right to occupy (lease/easement) all landside locations along the proposed cable route" that it requested, or explanations as to why it could not obtain such authorizations prior to receiving DRI approval. Additionally, Cape Wind agreed to extend the DRI decision deadline by two weeks even though the Cape Cod Act did not require it to give the commission additional time. See St. 1989, c. 716, § 13 (*a*) ("time limit may be extended *by mutual agreement* with the applicant" [emphasis added]). We conclude that substantial evidence supports the siting board's finding that Cape Wind made a good faith effort to obtain DRI approval, and we defer to that finding. See *Andover v. Energy Facilities Siting Bd.*, 435 Mass. 377, 391 (2001).

3. *Scope of the record.* The commission next claims that the siting board made its decision in violation of 980 Code Mass. Regs. § 6.03(1) (1993), by denying the commission's motion to limit the record before the siting board to the record before the commission during the DRI review process. The cited regulation states in relevant part that "[w]hen adjudicatory findings of fact in the context of a final decision made by an agency . . . are challenged . . . review by the [siting board] of said findings shall be limited to the record presented before the agency." *Id.* The siting board determined that this regulation did not apply because the commission did not conduct an adjudicatory hearing to review Cape Wind's DRI application. Although the commission held public hearings and heard public comments, it did not take formal testimony, permit cross-examination, or make credibility determinations. Cf. *School Comm. of Hudson v. Board of Educ.*, 448 Mass. 565, 577 (2007) ("[T]hat a public hearing was required . . . does not render the process . . . adjudicatory . . . . Under the statutory and regulatory scheme, the [siting] board is not required to take formal testimony, hear or cross-examine witnesses, or assess the credibility of witnesses or information submitted"). We defer to the siting board's reasonable reading of 980 Code Mass. Regs. § 6.03(1). See *Hurst v. State Ballot Law Comm'n*, 428 Mass. 116, 120 (1998) ("agency's interpretation of its own regulation is entitled to 'substantial deference' ").

4. *Section 69O findings.* a. *Need and cost.* The petitioners all claim that the siting board failed to make certain findings required by § 69O, rendering its decision in violation of statutory requirements and unsupported by substantial evidence. First, with respect to need and cost, as noted previously, § 69O (1) requires a finding of:

> "the *need for the facility* to meet the energy requirements of the applicant's market area taking into account wholesale bulk power or gas sales or purchases or other co-operative arrangements with other utilities and energy policies as adopted by the commonwealth" (emphasis added);

and § 69O (3) requires a finding with respect to:

> "[t]he extent to which construction and operation of the facility will fail to conform with existing state and local laws, ordinances, by-laws, rules and regulations and reasonableness of exemption thereunder, if any, consistent with the implementation of the energy policies contained in this chapter to provide a *necessary energy supply* for the commonwealth with a minimum impact on the environment at the *lowest possible cost*" (emphases added).

As to § 69O (1), the commission argues that the siting board heard no evidence of need for the project to meet the energy requirements of Cape Wind's market area; and that, rather than making findings of need and cost, the siting board "took the unprecedented position that construction of the [wind farm] conclusively establishes the 'need' for the [p]roject under §§ 69J and 69O." As to § 69O (3), the Alliance adds that the cost of energy supply encompasses more than just the cost of the transmission lines.

The siting board rejected the petitioners' argument that § 69O requires it to assess the need for and cost of the wind farm, as opposed to the transmission lines. The siting board reasoned that it could not include the wind farm in a need or cost assessment due to the wind farm's location in Federal waters and, even setting the preemption problem aside, because the 1997 Electric Restructuring Act amended G. L. c. 164 to eliminate

considerations of need with respect to generating facilities. See G. L. c. 164, § 69J¼, inserted by St. 1997, c. 164, § 210 ("Nothing in this chapter shall be construed as requiring the [siting] board to make findings regarding the need for, the cost of, or alternative sites for a generating facility . . ."). See also G. L. c. 164, § 69O½, inserted by St. 1997, c. 164, § 223 (setting forth findings required to support siting board decision on petition pursuant to G. L. c. 164, § 69K½, for certificate of environmental impact and public interest for generating facility and including same requirements as § 69O, but not requiring finding of need for the facility).[40] The siting board explained:

> "It is not reasonable to assume that the Legislature intended to prohibit the [siting board] from directly assessing the need for generation facilities . . . yet intended for the [siting board] to perform a 'backdoor,' indirect assessment of need for the generating facility when the [siting board] considers a [c]ertificate for a transmission line. At the very least, the statute is ambiguous as to this issue, and the [s]iting [b]oard therefore exercises its discretion to interpret the statute in a manner that achieves the underlying purpose of the 1997 Electric Restructuring Act, which was to allow the marketplace, rather than a state regulatory body, to determine the need for generation facilities."

This court has agreed with the siting board that the 1997 Electric Restructuring Act "changed the rules with respect to the manner in which the [siting] board evaluates the need for proposed energy facilities." *Alliance I*, 448 Mass. at 51. Given the 1997 amendments, we agreed that "the [siting] board could no longer consider . . . the need for the generating facility that the proposed transmission lines would serve." *Id.* at 53. We held that the siting board had discretion to announce a new approach, under which it considers "(1) whether the 'existing

---

[40]The 1997 Electric Restructuring Act also amended G. L. c. 164, § 69H, as appearing in St. 1992, c. 141, § 9, changing the siting board's mandate from providing a "necessary energy supply" to providing "a reliable energy supply" and adding that "the [siting] board shall review only the environmental impacts of generating facilities, consistent with the . . . policy of allowing market forces to determine the need for and cost of such facilities." St. 1997, c. 164, § 204.

694                                                457 Mass. 663 (2010)

Alliance to Protect Nantucket Sound, Inc. *v.* Energy Facilities Siting Board.

transmission system is inadequate to interconnect the new or expanded generator' and (2) whether the 'new or expanded generator is likely to be available to contribute to the regional energy supply.' " *Id.* If a generating facility lies outside the siting board's jurisdiction, a showing for purposes of the second consideration " 'may be made on a case-by-case basis based on indicators of project progress (e.g., progress in permitting . . .).' This approach is particularly appropriate if the generating facility . . . is within the jurisdiction of the United States government, and Federal agencies will be making critical decisions about its permitting."[41] *Id.*

Applying this approach here, the siting board looked to findings it had made in its earlier decisions on the Cape Wind transmission project under § 69J and G. L. c. 164, § 72 (§ 72), to the effect that Cape Wind had established that the existing transmission system was inadequate to support the wind farm and, thus, the transmission project was needed to contribute to the regional energy supply. Because these findings were based on the availability of the wind farm, the siting board conditioned its approval of the transmission project in its § 69J decision on Cape Wind's submission to the siting board of copies of all permits required to build the wind farm. See *Alliance I*, 448 Mass. at 50, 54. As the record in the subsequent § 69K proceeding indicated no material changes with respect to the need for the transmission project, the siting board found that the project satisfied § 69O (1) and (3). We see no reason why this approach, upheld in the § 69J context, see *id.*, should not apply as well in the §§ 69K and 69O context. In sum, we defer to the siting board's reasonable interpretation of § 69O.[42]

b. *Environmental impact.* The petitioners next argue that the

---

[41]We reasoned that an "attempt by the [siting] board to predict the decisions of Federal agencies would constitute an exercise in administrative inefficiency and waste the time and effort of the siting board and the applicants." *Alliance I*, 448 Mass. at 53.

[42]We address briefly the petitioners' general claim that the siting board erred by relying on findings of need made in its earlier proceedings. Nothing in the siting board statute or its regulations requires the siting board to conduct, in a certificate proceeding under G. L. c. §§ 69K-69P, a de novo review of issues such as need or cost that it has addressed in a § 69J proceeding. Cf. *City Council of Agawam* v. *Energy Facilities Siting Bd.*, 437 Mass. 821, 829 (2002) ("A certificate proceeding conducted pursuant to [G. L. c. 164,

siting board made insufficient findings under § 69O (2) and (3) with respect to the environmental impact of the transmission project. Specifically, they claim that the siting board (a) failed to find that the project will have a *minimum* impact on the environment; (b) improperly relied on findings made in its § 69J decision; (c) erred in failing to require Cape Wind to conduct diver surveys of eelgrass locations along the entire transmission line route and provide additional core samples to demonstrate impacts of dredging; and (d) improperly excluded evidence of the wind farm's in-State impacts, separate from the transmission project. The claims must be rejected.

First, the commission's premise that the siting board must find the project will have a minimum impact on the environment is not correct. Section 69O (2) requires a finding with respect to the "compatibility of the facility with *considerations of environmental protection*," and § 69O (3) requires a finding that any exemption from conformance with State or local law be "consistent with the implementation of the energy policies contained in this chapter to provide *a necessary energy supply for the commonwealth with a minimum impact on the environment at the lowest possible cost*" (emphases added). The siting board made both of these findings. Second, as stated (see note 42, *supra*), the siting board properly looked to findings it had made in its §§ 69J and 72 decisions, including findings (in the § 69J decision) that "the proposed transmission lines were preferable to all alternatives with respect to environmental impacts" and that conditions to which Cape Wind agreed relating to eelgrass, protected coastal shorebirds, navigation, traffic, and historic preservation would minimize the environmental impacts of the transmission project. Like § 69O, § 69J requires the siting board to consider whether a proposed facility is "consistent with the policies stated in [§ 69H]," that is, "to provide a reliable energy supply for the commonwealth with a minimum impact on the environment at the lowest possible cost." G. L. c. 164, § 69H. "[W]ords used in one part of a statute to connote a particular meaning should be given the

---

§ 69K½,] is not a vehicle for the relitigation of issues that have already been fully and fairly determined" in § 69J proceedings). In the present case, the record reflects that the siting board considered additional evidence and found no material changes with respect to the need for the transmission project.

same meaning in another part of the same statute," *Commonwealth* v. *Burnham*, 451 Mass. 517, 521 (2008), and we reject the contention that findings made in the § 69J context may have no bearing on § 69O findings. In any case, the siting board did not rely solely on its earlier decisions. It reexamined the environmental impacts of the transmission project in light of additional evidence that the parties presented during the certificate proceedings, which included the testimony of two Cape Wind experts, testimony of Alliance and commission witnesses, testimony from a DEP environmental analyst, and extensive documentary evidence.

The siting board focused its inquiry on three environmental concerns that the commission had cited in its denial of Cape Wind's application for DRI approval: (1) general impacts of jet-plowing for transmission cable installation; (2) impacts of cable installation on eelgrass beds[43]; and (3) the proposed location of a transition vault connecting the submarine and upland transmission lines in a Federal Emergency Management Agency "Velocity Zone" (FEMA V-zone) and within one hundred feet of a coastal bank. The siting board found that it had given each issue extensive consideration in its prior decisions; each issue had also received a favorable review by DEP and by EOEEA in the MEPA process; and no information presented during the § 69K certificate proceedings called the siting board's earlier determinations into question. We defer to these findings, which are supported by substantial evidence in the record.[44] See *Andover* v. *Energy Facilities Siting Bd.*, 435 Mass. at 386, 388.

As to jet-plowing, the commission had determined that this method of installation implicated minimum performance standard (MPS) 2.2.3.6, a standard set forth in the commission's RPP that prohibits new dredging unless needed to provide substantial

---

[43]Eelgrass grows in intertidal and subtidal areas, providing cover and habitat for shellfish and fish.

[44]We reject the commission's unsupported claim that Cape Wind's experts were not qualified to testify on these matters and improperly relied on hearsay documents. The record contains substantial evidence of the experts' qualifications, and hearsay is admissible in administrative proceedings. *Box Pond Ass'n* v. *Energy Facilities Siting Bd.*, 435 Mass. 408, 418 (2001), citing *School Comm. of Brockton* v. *Massachusetts Comm'n Against Discrimination*, 423 Mass. 7, 15 (1996).

public benefit and no feasible alternative exists. The commission had concluded that more core samples were necessary to determine the impact of jet-plowing on eelgrass and shellfish resources. Cape Wind had argued to the commission, and offered expert testimony to the siting board, that jet-plowing is necessary to install the transmission lines and has fewer environmental impacts than other installation methods. Witnesses further stated that Cape Wind had taken nineteen core samples in State waters to measure the impact of jet-plowing, a sample size deemed adequate by DEP and other permitting agencies. Cape Wind also pointed the siting board to monitoring and mitigation measures it has proposed to undertake. After assessing this issue in light of its earlier proceedings and the evidence adduced in the § 69K certificate proceedings, the siting board found jet-plowing consistent with considerations of environmental protection, a finding supported by substantial evidence. There was no error in the siting board's decision not to require Cape Wind to conduct additional core sampling.

As for eelgrass, in the DRI proceeding the commission had cited MPS 2.2.3.7, which requires that development have "no significant adverse direct or indirect effect on eelgrass beds, unless there is no feasible alternative and the project is necessary to accomplish a public benefit," and had asked Cape Wind to perform diver surveys of the entire transmission line route within State waters, in addition to the diver surveys Cape Wind had already conducted in Lewis Bay. The siting board did not find that eelgrass concerns made construction and operation of the transmission lines inconsistent with environmental protection. The siting board reasoned that Cape Wind had conducted side-scan sonar surveys of the entire transmission line route, which according to Cape Wind experts reduced the potential for mapping errors, and had also conducted site-specific visual inspection by divers. The siting board also noted that Cape Wind has agreed to extensive monitoring and mitigation efforts to protect eelgrass, including additional diver surveys if additional eelgrass beds are identified. The findings are supported by substantial evidence.

Finally, with respect to the transmission vault, the commission had pointed to MPS 2.2.2.1, which prohibits development in a FEMA V-zone, an area subject to hundred year storms. While the commission permits construction of water-dependent structures in

a FEMA V-zone absent a feasible alternative, it had determined in its decision that the vault did not meet the RPP definition of a "water-dependent use." The commission had also cited MPS 2.2. 2.4, which prohibits nonwater-dependent development within one hundred feet of a coastal bank. The commission had recommended that Cape Wind relocate the vault 225 feet landward to comply with both MPSs. The siting board, however, found that the costs of moving the vault — including increased noise, traffic, and reduced reliability — outweighed any benefits associated with avoiding the FEMA V-zone and coastal bank buffer. This finding also is supported by substantial evidence.

c. *Conformance with existing law.* The petitioners make a related claim that the siting board made inadequate findings to satisfy the "reasonableness of exemption" standard in § 69O (3). The Alliance and Barnstable argue that "reasonableness" should be construed broadly to authorize and require review of the in-State impacts of Cape Wind's entire enterprise and to preclude the siting board from relying on earlier decisions in determining whether the standard was met. However, the term "reasonableness" does not trump the exclusivity of Federal review over the wind farm itself, as earlier discussed.

Additionally, the siting board properly relied on its findings in the §§ 69J and 72 proceedings where § 69O (3) directs it to review reasonableness "consistent with the implementation of the energy policies contained in this chapter." See note 36, *supra.* The siting board fully addressed the reasonableness standard and articulated support for its conclusions.

C. *Water-dependent use regulation.* Finally, the Alliance challenges the validity of a regulation promulgated by DEP on October 3, 2008, 310 Code Mass. Regs. § 9.12(2)(b)(10) (water-dependent use regulation, or regulation),[45] as contrary to DEP's relevant governing statutes, c. 91, §§ 1, 2, 14, and 18,

---

[45]Title 310 Code Mass. Regs. § 9.12(2)(b)(10) (2008) provides:

"(2) [DEP] shall determine a use to be water-dependent upon a finding that said use requires direct access to or location in tidal or inland waters, and therefore cannot be located away from said waters. . . . (b) [DEP] shall find to be water-dependent-industrial the following uses: . . . 10. infrastructure facilities used to deliver electricity . . . services to the public from an offshore facility located outside the Commonwealth."

violative of DEP's responsibilities under the public trust doctrine, and arbitrary.

We review briefly certain statutory and regulatory provisions pertinent to the Alliance's challenge. General Laws c. 91, § 2, directs DEP, in issuing licenses pursuant to that chapter, to "protect the interests of the commonwealth" in the tidelands. Section 14 of c. 91 thereafter states that "[e]xcept as provided in [c. 91, § 18, relating to nonwater-dependent uses], no structures or fill may be licensed on . . . commonwealth tidelands unless such structures or fill are necessary to accommodate a water dependent use; provided that for commonwealth tidelands said structures . . . shall also serve a proper public purpose and that said purpose shall provide a greater public benefit than public detriment to the rights of the public in said lands." To help implement this section, DEP promulgated 310 Code Mass. Regs. § 9.31(2)(a) (1996), a regulation that creates a rebuttable presumption that a "water-dependent use" serves a proper public purpose that provides a greater benefit than detriment to the rights of the public.[46] In this case, based on the water-dependent use regulation, DEP deemed Cape Wind's proposed transmission lines water dependent and found nothing to rebut the proper public purpose presumption established by § 9.31(2)(a). The siting board incorporated this finding into its certificate decision.

"A highly deferential standard of review governs a facial challenge to regulations promulgated by a government agency." *Massachusetts Fed'n of Teachers* v. *Board of Educ.*, 436 Mass. 763, 771 (2002). One who challenges a regulation's validity "must prove 'that the regulation is illegal, arbitrary, or capricious.' " *Id.*, quoting *Borden, Inc.* v. *Commissioner of Pub. Health*, 388 Mass.

---

[46]Title 310 Code Mass. Regs. § 9.31(2)(a) (1996) provides:

"(2) *Proper Public Purpose Requirement.* No license or permit shall be issued by [DEP] for any project on tidelands . . . unless said project serves a proper public purpose which provides greater benefit than detriment to the rights of the public in said lands. In applying 310 [Code Mass. Regs. § ] 9.31(2), [DEP] shall act in accordance with the following provisions.

"(a) *Water-Dependent Use Projects.* [DEP] shall presume 310 [Code Mass. Regs. § ] 9.31 (2) is met if the project is a water-dependent use project."

707, 722, cert. denied sub nom. *Formaldehyde Inst., Inc.* v. *Frechette,* 464 U.S. 936 (1983). We apply all rational presumptions in favor of validity, and cannot declare a regulation void "unless its provisions cannot by any reasonable construction be interpreted in harmony with the legislative mandate." *Massachusetts Fed'n of Teachers* v. *Board of Educ., supra,* quoting *Consolidated Cigar Corp.* v. *Department of Pub. Health,* 372 Mass. 844, 855 (1977).

The Alliance has not met its burden to establish invalidity. It claims that the water-dependent use regulation violates the governing statute, c. 91, because c. 91, § 1, defines "water-dependent uses" as "those uses and facilities which *require* direct access to, or location in, marine or tidal waters and which therefore cannot be located inland" (emphasis added), and wind farms can be located inland. But the water-dependent use regulation applies solely to "infrastructure facilities used *to deliver* electricity . . . from an offshore facility" (emphasis added), not to the offshore facility itself.

The premise underlying all the Alliance's challenges to the water-dependent use regulation is that c. 91, §§ 2, 14, and 18, do not permit DEP to define as "water-dependent" — and thus presumptively serving a proper public purpose — any use of an infrastructure facility associated with a generating facility unless DEP also evaluates the impacts of the generating facility itself. Because the premise is flawed, the Alliance's claims fail.

As we have discussed in relation to the siting board, if a generating facility is located offshore in Federal waters, a State agency such as DEP has no jurisdiction over the facility under c. 91 or otherwise, and is not in a position to assess its allegedly adverse impacts on the Commonwealth. But it is also obvious that if such a generating facility receives the necessary Federal permits and is constructed, an "infrastructure facility" such as the transmission lines must have a "direct . . . location in . . . tidal waters," c. 91, § 1, in order to perform its function of delivering electricity.[47] Accordingly, it was rational for DEP to adopt a regulation that focuses solely on the infrastructure facility used to transmit electricity from the offshore and out-of-

---

[47]The wording of 310 Code Mass. Regs. § 9.12(2)(b)(10) appears to link a determination that the infrastructure facility is covered by that regulation, and therefore "water-dependent," with the generating facility's existence and corresponding receipt of all necessary Federal permits. This is consistent with the

jurisdiction generating facility, and it was rational for DEP to define such an infrastructure facility as "water-dependent." See *Brackett* v. *Civil Service Comm'n*, 447 Mass. 233, 254 (2006). The Alliance has not shown that the water-dependent use regulation is arbitrary, irrational, or contrary to c. 91. The regulation's validity must be upheld. See *id.* at 254-255.

*Conclusion.* Case no. SJC-10596 is remanded to the county court. Judgment is to enter affirming the decision of the Energy Facilities Siting Board and declaring that 310 Code Mass. Regs. § 9.12 (2)(b)(10) is a valid regulation. In case no. SJC-10578, the judgment of dismissal is affirmed.

*So ordered.*

MARSHALL, C.J. (concurring in part and dissenting in part, with whom Spina, J., joins). The development of clean energy resources is an important national and State policy. The offshore wind-powered energy generating facility (wind farm) that Cape Wind, LLC (Cape Wind), proposes to construct in Nantucket Sound may further that policy by providing clean energy for the Commonwealth. It is not our role, however, to evaluate whether as a matter of sound policy the project should be constructed. Rather, we must determine whether the approval process of the Cape Wind project comports with the laws of the Commonwealth. It does not. Today's decision that the "certificate of environmental impact and public interest" (certificate), G. L. c. 164, § 69K (§ 69K), issued by the Energy Facilities Siting Board (siting board) was proper is contrary to existing law and seriously undermines the public trust doctrine, which for centuries has protected the rights of the people of Massachusetts in Commonwealth tidelands.[1]

The court concludes that the *Commonwealth* has fulfilled its fiduciary obligation to the people of Massachusetts because the

---

approach that DEP, as well as the siting board, took in this case insofar as both conditioned the c. 91 license on Cape Wind's receipt of all necessary Federal (and State) permits for the construction and operation of the wind farm itself.

[1]For a description of the terms "tidelands" and "Commonwealth tidelands," see *ante* at n.25.

*siting board* has issued a certificate to Cape Wind under § 69K authorizing transmission cables to traverse Commonwealth tidelands. See *ante* at 679-681. The siting board, however, does not have, and was not intended by the Legislature to have, the right to act as fiduciary on behalf of the people with regard to Commonwealth tidelands or to approve energy projects up and down the coastline of Massachusetts in Commonwealth tidelands. It may be that the Legislature or the Legislature's expressly authorized designee, exercising its responsibility as fiduciary, would conclude that transmission cables stretching across Commonwealth tidelands from the shore to the Commonwealth's seaward boundary should be approved. But that authorization has not occurred. The court's ruling to the contrary establishes a dangerous and unwise precedent, which has far-reaching consequences. A wind farm today may be a drilling rig or nuclear power plant tomorrow.

The court also concludes that the siting board acted appropriately by granting the certificate without considering *any* of the in-State impacts of the wind farm. See *ante* at 686-687. Centuries of legislation and jurisprudence concerning the paramount rights of the people of the Commonwealth to the use of the sea and shore lead me to disagree. The stakes are high. As we have recently seen in the Gulf of Mexico, the failure to take into account in-State consequences of federally authorized energy projects in Federal waters can have catastrophic effects on State tidelands and coastal areas, and on all who depend on them.

The public trust doctrine stands as a covenant between the people of the Commonwealth and their government, a covenant to safeguard our tidelands for all generations for the use of the people, traditionally for fishing, fowling, and navigation. See *Moot* v. *Department of Envtl. Protection*, 448 Mass. 340, 342 (2007) (*Moot I*); *Fafard* v. *Conservation Comm'n of Barnstable*, 432 Mass. 194, 198 (2000) (*Fafard*), and cases cited. The doctrine, and with it the public's trust in government, once undermined is not easily restored. The court's judgment, I fear, is a step in the wrong direction. I respectfully dissent.[2]

---

[2] I agree with the court's resolution of the other issues raised by the petitioners.

## A

The court acknowledges, as it must, that only the Commonwealth, or an entity to which the Legislature "properly has delegated authority," may administer public trust rights. *Ante* at 677, quoting *Fafard, supra* at 199. I cannot agree with the court's conclusion that the Legislature has delegated such authority to the siting board. In *Fafard, supra* at 197, we once again made clear that only the Commonwealth or an "entity to which the Commonwealth has delegated authority *expressly*" may administer public trust rights (emphasis added). Accord *Moot I, supra* at 347 (same). See *Commonwealth* v. *Charlestown*, 1 Pick. 180, 185 (1822) (Legislature may "delegate" power under public trust doctrine to authorize construction of bridge over navigable waterway, "but, until they have made such delegation in *express* terms, it is a branch of sovereign power to be exercised by the [L]egislature alone" [emphasis added]). The siting board's enabling legislation provides for no such express delegation.

The requirement that any delegation by the Legislature of authority to administer public trust rights be "express" is rooted in the "history of the origins of the Commonwealth's public trust obligations and authority, as well as jurisprudence and legislation spanning two centuries." *Fafard, supra* at 199. That history, jurisprudence, and legislation has been recounted frequently and at length elsewhere. See, e.g., *Arno* v. *Commonwealth, ante* 434, 449-453 (2010) (*Arno*); *Boston Waterfront Dev. Corp.* v. *Commonwealth*, 378 Mass. 629, 631-649 (1979). Briefly, as protector of the public trust, the Commonwealth sits "in a fiduciary relation" to the people. *Commonwealth* v. *Roxbury*, 9 Gray 451, 492 (1857). Commonwealth tidelands are "impressed with a public trust, which gives the public's representatives an interest and responsibility" in their development. *Boston Waterfront Dev. Corp.* v. *Commonwealth, supra* at 649. See *Trio Algarvio, Inc.* v. *Commissioner of the Dep't of Envtl. Protection*, 440 Mass. 94, 97 (2003) (Legislature has "obligation to protect the public's interest").

The Commonwealth may delegate, and of course has delegated, the responsibility, or some of it, to administer its tidelands to a State agency. See *Moot I, supra*, and cases cited. As noted, that delegation, when it occurs, must be explicit. Thus, pursuant to

G. L. c. 91, the Department of Environmental Protection (DEP) may issue licenses for the construction of structures "in or over tide water" or cables "under tide water." *Id.* at § 14. See *id.* at § 18 (such licenses are "revocable"). The Legislature has been unmistakably clear that in granting such licenses DEP "shall protect the interests of the commonwealth" and its inhabitants in "lands, rights in lands, flats, shores," "rights in tide waters," and "tidelands" within the Commonwealth. *Id.* at § 2. See *Moot I, supra* at 342-343 ("obligation to preserve the public trust" has been expressly delegated by Legislature to DEP).[3]

The court reasons that because the Legislature has expressly delegated authority to administer public trust rights to DEP, and because § 69K, in the court's view, directs the siting board to "stand in the shoes" of DEP, *ante* at 678, § 69K provides a "sufficiently articulated legislative delegation of authority" to the siting board to administer public trust rights. *Ante* at 679. I cannot agree. The siting board cannot "stand in the shoes" of DEP with respect to the administration of public trust rights unless the Legislature has expressly authorized it to do so. Such an express authorization is the only "articulation" that is "sufficient" to delegate fiduciary responsibilities. See *Fafard, supra* at 198-199 (town may not administer public trust rights in DEP's place without express delegation of authority).

The court supports its conclusion by pointing to language in § 69K authorizing the siting board, in certain circumstances, to

---

[3]The Legislature has also expressly delegated certain aspects of its authority and obligations under the public trust doctrine to the Department of Conservation and Recreation (DCR) (see definition of "Department" in G. L. c. 91, § 1), which shall "have charge of the lands, rights in lands, flats, shores and rights in tide waters belonging to the commonwealth . . . . In carrying out its duties under the provisions of this chapter, [DCR] shall act to preserve and protect the rights in tidelands of the inhabitants of the commonwealth by ensuring that the tidelands are utilized only for water-dependent uses or otherwise serve a proper public purpose." G. L. c. 91, § 2.

The express delegations to the Department of Environmental Protection (DEP) and DCR in G. L. c. 91 encompass "at least some" of the Commonwealth's authority and obligations under the public trust doctrine. *Moot* v. *Department of Envtl. Protection*, 448 Mass. 340, 347 (2007) (*Moot I*). See *Fafard* v. *Conservation Comm'n of Barnstable*, 432 Mass. 194, 200 n.11 (2000) (*Fafard*) ("the Commonwealth's authority and obligations under [G. L. c. 91] are not precisely coextensive with its authority and obligations under the public trust doctrine").

issue a certificate with respect to a proposed energy facility that "shall be in the form of a composite of all individual permits, approvals or authorizations which would otherwise be necessary for the construction or operation of the facility." *Ante* at 677. That language, as does the rest of § 69K, makes no reference to tidelands and lacks any recognition of public trust rights, and, contrary to the court's conclusion, the Legislature has *not* "expressly vested authority" in the siting board to act with respect to public trust rights. *Ante* at 678. The court cites no precedent supporting its "reading" of the statute, and there is none. See *ante* at 678-681.[4] Rather, the court's "reading" of the statute is at odds with our prior public trust jurisprudence, both ancient and contemporary.

We recently held that broad language in G. L. c. 185, § 45 (registration act), authorizing the Land Court to issue a judgment after a land registration proceeding that "shall be conclusive upon and against *all* persons, *including the commonwealth*" (emphasis added), was *not* sufficient to constitute "an express delegation" to relinquish the rights of the public held in trust by the Commonwealth. *Arno, supra* at 451. The registration act in *Arno*, like the siting board statute, G. L. c. 164, §§ 69G-69Q, makes no reference to tidelands or to the public's rights therein. It is inconsistent with *Arno* to reason that an express delegation of authority by the Legislature to DEP to administer public trust

---

[4]At oral argument, the assistant Attorney General, as counsel for the Energy Facilities Siting Board (siting board) and DEP, argued that "a delegation of authority by the Legislature to license facilities in tidelands need not refer to the public trust doctrine to be effective," pointing to dicta in *Fafard, supra* at 199 n.10. The court makes essentially the same point, *ante* at 678, but the point proves nothing. Each statute referenced in the *Fafard* case, unlike the siting board's enabling statute, expressly authorizes the issuance of licenses for or regulation of certain uses in or on tidewater, tidelands, or tidal flats, thereby making clear the invocation of the public trust doctrine. See G. L. c. 91, § 1 (definition of "tidelands"); G. L. c. 130, § 57 (issuance of shellfish aquaculture licenses by city or town authorizing activities "in, upon, or from a specific portion of coastal waters of the commonwealth, of tidal flats or land under coastal waters"); G. L. c. 130, § 29 (authorization by city or town of construction of weirs, pound nets, and fish traps "in tidewater in locations where no harbor lines exist and also in locations beyond established harbor lines" within limits of city or town "lying upon coastal waters"); G. L. c. 91, § 10A (authorization by "harbormaster" of "the mooring on a temporary basis of floats or rafts held by anchors or bottom moorings" on "private flats" if not "objected to by the owner of owners thereof").

rights can constitute "express" delegation to the siting board because of broad language in § 69K, which is even less specific than the language at issue in *Arno*. In *Arno*, as in *Moot I*, *supra* at 351-353, there was a relinquishment or extinguishment of the public's rights in Commonwealth tidelands, while here there is not. The court correctly notes that the decisions of this court have "recognized a difference" between a legislative delegation of authority to *administer* public trust rights and duties and a permanent *relinquishment* of the public's rights in tidelands. *Ante* at n.30. But that difference is inconsequential in the context of this case. In either circumstance (delegation of authority to administer the rights or relinquishment of the rights) our jurisprudence has made abundantly clear that the Legislature *must* act *expressly*. It has not done so here.[5]

Were the siting board statute itself and the case law not sufficiently clear to require a different outcome of this case, and they are, the legislative history of the creation of the siting board confirms that the Legislature did *not* in fact delegate authority to the siting board to administer public trust rights. In 1971, in the face of a looming energy crisis of proportion equal to any today, the Legislature created an Electric Power Plant Siting Commission (commission) to make "an investigation and study of the *regulatory procedures* employed by the commonwealth and by its political subdivisions relative to the location and operation of electric utility generation and transmission facilities" (emphasis added). Res. 1971, c. 78. The Legislature directed the commission to consider "the adequacy of existing state and municipal *regulatory procedures* to permit the furnishing of a sufficient supply of electric energy while, at the same time, preserving and protecting land, air and water resources" (emphasis added). *Id.* In particular, the commission was directed

---

[5]Without any support in the text of the statute, the court concludes that G. L. c. 164, § 69K (§ 69K), delegates to the siting board not only the power to administer public trust rights in DEP's stead but also the "obligation" to protect the interests of the Commonwealth and its inhabitants in doing so. *Ante* at 678-679. The court's attempt to mitigate the dangerous implications of the precedent it is setting is laudable. But the utter lack of textual support for the court's conclusion concerning the siting board's public trust *obligations* under § 69K only reinforces the error of the court's conclusion that the Legislature has expressly delegated to the siting board the *power* to administer public trust rights.

to consider the "feasibility of a comprehensive state *regulatory* jurisdiction over the siting of electric generating plants and routing of major transmission facilities" (emphasis added). *Id.* Nowhere in the commission's charge did the Legislature address expressly, or by implication, public trust rights in the Commonwealth's tidelands.[6]

The commission filed three reports — 1973 House Doc. No. 5891 (First Report), 1973 House Doc. No. 5892 (Second Report), and 1973 House Doc. No. 6190 (Third Report) — the third of which proposed statutory language that would eventually create the siting board. See Appendix A to Third Report, *supra* at 31-43. That language, along with other related proposals,[7] was considered by the House Committee on Government Regulations (committee). See 1973 House Doc. No. 7634. The committee then drafted a new bill, based in substantial part on the commission's proposed language, that, after various amendments, was passed by the House. See *id.*; 1973 House Doc. No. 7768; 1973 House J. 3239, 3259, 4688. The Senate enacted the bill after making additional minor amendments, and the House adopted those amendments. See 1973 House J., *supra* at 3477, 3492, 4688-4689.

The Governor received memoranda from the Department of Public Utilities, the Department of Natural Resources, and the Executive Office of Environmental Affairs offering advice about the final bill. While the Department of Public Utilities offered no objection, the latter two agencies opposed the passage of the

---

[6]On creating the Electric Power Plant Siting Commission (commission), the Legislature directed the commission to "study the subject matter" of various bills then pending in the House of Representatives. Res. 1971, c. 78. None of those bills made any reference, express or implicit, to tidelands or the public's rights therein. See *id.* (summarizing contents of those bills as follows: 1971 House Doc. No. 939, "directing the department of public utilities to promulgate rules regulating certain expenses of certain utility companies"; 1971 House Doc. No. 1131, "establishing the department of public utilities as the responsible planning agency for proper utility service"; 1971 House Doc. No. 1331, "relative to the hazards, inconveniences and service interruptions of overhead electric power transmission"; 1971 House Doc. No. 1515, "to protect municipal park, forest and conservation lands"; 1971 House Doc. No. 2031, "requiring the installation of electric substations underground by electric companies"; 1971 House Doc. No. 3039, "relating to location of thermal power plants").

[7]1973 House Doc. No. 3662; 1973 House Doc. No. 5290; 1973 Senate Doc. No. 468; 1973 Senate Doc. No. 500.

bill exclusively on environmental grounds. Nevertheless, the Governor signed the final bill into law as G. L. c. 164, §§ 69G-69R. See St. 1973, c. 1232, § 1.[8]

The commission's reports make clear that, in creating the siting board, the Legislature's intent was to ensure that "state and municipal *regulatory procedures*" (emphasis added), Res. 1971, c. 78, balance the need for sufficient electric energy with "environmental protection, public health and public safety." Third Report, *supra* at 24, 41. See First Report, *supra* at 8 (discussing need for one agency to have power "to resolve the conflicts, such as between the utilities and environmentalists" and stating "[p]ower plant siting is primarily a question of land-use"). The extensive legislative history, including three commission reports, multiple drafts of the legislation, amendments in both houses, and memoranda to the Governor from various executive agencies, contains *no* reference to tidelands, tidewaters, tidal flats, land under coastal waters, the public trust, or the traditional rights of navigation, fishing, and fowling. See note 4, *supra*. The silence is deafening.

The only reference in the legislative history of the siting board that might potentially relate to public trust rights cuts against the court's conclusion that DEP's expressly delegated authority to administer public trust rights in Commonwealth tidelands can be exercised by the siting board. In its Second Report, issued in December, 1972, the commission suggested that the Legislature pass a resolution that would, among other things, expand the commission's scope of study to include "the total energy picture in regards to the long-range planning needs of the commonwealth." Second Report, *supra* at 9. In July, 1973, four months after the commission issued its Third Report containing the language that in large part became G. L. c. 164, §§ 69G-69R, the Senate added language to amend the resolution proposed by the commission expanding its scope of investigation to include "the total energy picture in Massachusetts *except as it relates to offshore energy resources activities and offshore facilities*." (language added by Senate italicized). Res. 1973,

[8]General Laws c. 164, §§ 69G-69R, have been amended various times since their original enactment in 1973. None of those amendments bears on the analysis here.

c. 110. See 1973 Senate J. 1977; 1973 House J. 2501.[9] The resolution was adopted in August, 1973. Res. 1973, c. 110. Various new drafts of the bill that eventually created G. L. c. 164, §§ 69G-69R, were circulated in the following months. See 1973 House Doc. No. 7634 (filed in Oct. 1973); 1973 House Doc. No. 7768 (filed in Nov. 1973).

The Legislature's decision expressly to exempt issues concerning "offshore energy resources activities and offshore facilities" from its expansion of the commission's scope of study reflects an understanding within the Legislature that concerns relating to offshore facilities were *not* part of the commission's scope of inquiry. This singular indication of the Legislature's consideration of issues potentially relevant to public trust rights in relation to the creation of the siting board suggests that the Legislature understood that the creation of the siting board would not implicate those rights.

The siting board's authority to grant a composite certificate is broad, but nothing in the statutory language, or its legislative history, indicates that such authority encompasses the power to act with respect to public trust rights. I would reverse on this ground alone.[10]

### B

The siting board's lack of any authority to act with respect to

---

[9]According to the House and Senate Journals, the added language was "except as it relates to *all* offshore energy resources activities and offshore facilities" (emphasis added). 1973 Senate J. 1977; 1973 House J. 2501. As published, Res. 1973, c. 110, does not include the word "all"; the discrepancy is immaterial.

[10]The court notes that DEP participated as an intervener in the § 69K proceeding concerning the Cape Wind, LLC (Cape Wind), project and that the commissioner of DEP sits on the siting board. *Ante* at n.29. The court also points out that the siting board incorporated DEP's findings into its certificate decision without DEP's objection. *Ante* at n.27. As the court recognizes, *ante* at n.30, none of these facts is sufficient to constitute the "express" delegation our cases require. Nevertheless, by approving of the certificate issued by the siting board, the court effectively sanctions DEP's abdication of DEP's fiduciary duties. Cape Wind and the Attorney General are simply wrong to assert that the siting board did not "usurp" DEP's role in deciding whether to issue a G. L. c. 91 tidelands license and that the substantive and procedural requirements of G. L. c. 91 have been satisfied. See *ante* at n.14 (adjudicatory hearing on DEP draft license stayed pending decision in this case).

public trust rights is sufficient to overrule its decision to grant the certificate to proceed with the transmission cables in the absence of final approval from DEP. I also dissent for a second, and independent, reason. Even if the siting board had the authority to act with respect to public trust rights, which I do not accept, the siting board's position that it was under no obligation to consider — and indeed could not consider — any in-State impacts of the operation of the wind farm is untenable. What is the role of a State agency if not to safeguard in-State interests?

The court acknowledges the petitioners' argument that if the siting board had the authority to administer public trust rights, as a matter of "complying with public trust doctrine obligations," the siting board had the "duty" to consider the potential effects of the wind farm on the Commonwealth. *Ante* at 682-683. It then rejects that claim by recharacterizing it as one based on a "general tenet of environmental and perhaps all regulation of private development projects." *Ante* at 683. The court makes but a passing reference to the obligations imposed by the public trust doctrine, see *ante* at 686, and its rationales for approving the siting board's refusal to consider the impact of the wind farm on Commonwealth tidelands are unpersuasive.[11]

First, the court reasons that the siting board's enabling statute states "with unmistakable clarity" that the siting board's "regulatory point of focus at all times is to be on the proposed 'facility,' " and the proposed transmission lines constitute the only "facility" subject to the siting board's review in this case. *Ante* at 683. That may be so, but it says nothing about the responsibilities the siting board must exercise if it is (as the court concludes) wearing DEP's fiduciary hat. Rather, the court's reasoning on this point undermines its own rationale for concluding that the siting board has the authority to act with respect to public trust rights in the first place. The court concludes that the siting board may administer public trust rights because it is authorized

[11]The Attorney General asserts that the "only question" here is whether the siting board "reasonably construed its enabling act" when it did not review the in-State impacts of the wind farm. To the contrary, the question is whether any State entity, be it the siting board or DEP, could fulfil its fiduciary obligations under the public trust doctrine by approving the construction and operation of the transmission cables *without* considering the in-State impact of the wind farm.

to "stand in the shoes" of DEP. *Ante* at 678. The Legislature, of course, has charged DEP with the fiduciary responsibility to "protect the interests of the commonwealth" and its inhabitants, in the "tidelands." G. L. c. 91, § 2. If, as the court would have it, the siting board may act to affect public trust rights because it may stand in DEP's shoes, then, as the court explicitly acknowledges, see note 5, *supra*, the siting board has the obligation to act as fiduciary on behalf of the people of the Commonwealth when reviewing the proposal to construct and operate the transmission cables. No fiduciary — whether DEP or the siting board — can (or would) fulfil that fiduciary responsibility while turning a blind eye to the in-State impacts of the wind farm.[12] To the contrary, consideration of in-State impacts is integral to a determination whether the public trust has been violated.[13]

Second, moving beyond the siting board's enabling statute, the court concludes that neither the siting board, nor DEP, nor any other State entity,[14] may consider the in-State impacts of the federally located wind farm because to do so would involve the assertion of authority that "presumably" would encompass the "power to deny or condition" a certificate or license "on account of such impacts." *Ante* at 685. Such a denial or conditioning, the court reasons, would be "tantamount to the denial of the wind farm project itself," which the court says no State entity may do. *Ante* at 685. The reasoning is flawed.

Procedure does not determine outcome. As noted, no fiduciary acting on behalf of the people could or would *ignore* the potential impact on the public's rights that might flow from

---

[12]The court acknowledges that any in-State impact of the wind farm would flow directly from the approval of the transmission cables. See *ante* at 685.

[13]The court concludes that the siting board's presiding officer "did not abuse her discretion or commit other error of law" by ruling that evidence concerning in-State impacts of the wind farm was inadmissible. *Ante* at 686. To the extent that the court defers to the siting board's interpretations of its obligations under the public trust doctrine, such deference is inappropriate. Cf. *Moot* v. *Department of Envtl. Protection*, 448 Mass. 340, 352 (2007) (deference to DEP insufficient to overcome requirements of G. L. c. 91, which derive from public trust doctrine).

[14]As a single narrow exception, the court recognizes the authority of the Massachusetts Office of Coastal Zone Management to "review and comment on Federal permitting decisions" concerning the wind farm itself. *Ante* at n.35.

the construction and operation of the wind farm. The court condones the disregard of those fiduciary obligations by concluding that consideration of the in-State impacts would *necessarily* result in a denial or contingent approval for the transmission cables (and thereby the wind farm). I cannot accept that reasoning. Our role is not to assume the outcome but to ensure that the proper process has been followed. The cases on which the court relies for its statement that the siting board "does not have authority to do indirectly what it cannot do directly" are inapposite. *Ante* at 685, citing *Ten Taxpayer Citizens Group* v. *Cape Wind Assoc., LLC*, 373 F.3d 183, 197 (1st Cir. 2004), cert. denied, 543 U.S. 1121 (2005) (*Ten Taxpayer Citizens*), and *New England Legal Found.* v. *Massachusetts Port Auth.*, 883 F.2d 157, 174 (1st Cir. 1989) (*New England Legal Found.*). Each involved Federal and State efforts to regulate the same activity (construction of a data tower in Federal water in the *Ten Taxpayer Citizens* case; control of air traffic in the *New England Legal Found.* case). Such an overlap is not at issue here: the Federal government has exclusive jurisdiction to provide approvals necessary for the wind farm to be constructed in Federal waters,[15] while the State has exclusive jurisdiction to approve the construction of transmission cables through Commonwealth tidelands. See 43 U.S.C. § 1311(a) (2006) (States have "the right and power to manage, administer, lease, develop, and use" "lands

---

[15]To the extent that the court relies on our decision in *Alliance to Protect Nantucket Sound, Inc.* v. *Energy Facilities Siting Bd.*, 448 Mass. 45 (2006) (*Alliance I*), see *ante* at 683, 685, & 687, this reliance is misplaced. There, the plaintiff was seeking review of the siting board's conditional approval for the building and operation of the transmission lines. See *Alliance I, supra* at 46. The approval was conditioned on the submission by Cape Wind of all of the necessary Federal, State, and local permits for the construction of the wind farm. *Id.* We were in that case concerned primarily with the siting board's determination of "need," as well as the contingent nature of the siting board's decision. *Id.* at 50. We noted that "[t]he area in which the wind farm itself is proposed to be built is located in Federal waters and, thus, falls beyond the scope of the [siting] board's jurisdiction and this case." *Id.* at 48. As the petitioners suggest, that statement, while true, does not address whether the siting board must consider the in-State impacts of the wind farm when considering whether to approve the construction and operation of the transmission cables. It merely indicates that the siting board's jurisdiction does not extend to the permitting and approval of the wind farm itself. See *id.* at 53 ("Federal agencies will be making critical decisions about . . . permitting" of wind farm).

beneath navigable waters within the boundaries of the respective States . . . in accordance with applicable State law"). No one would suggest — or reasonably could suggest — that a private landowner would be "preempted" from denying permission to run transmission cables across its land to serve a facility built by a second private party on adjacent Federal land merely because the second party's project had won Federal approval.[16]

The question here is whether the Commonwealth is required to *consider* the potential impacts on the Commonwealth and its people were it to allow use of its tidelands for the transmission cables. How the siting board or DEP ultimately would respond after considering such impacts is not before us. I am not willing to assume, as the court does, that *any* action that could possibly result from such consideration would necessarily be preempted by Federal law. Nor am I willing to assume that the results of any evaluation of the in-State impact of the wind farm would never be taken into consideration by Federal authorities. Comity within our Federal system has more meaning than the court's crabbed approach.[17]

## C

The public trust doctrine and government energy policy are

[16]The court's reliance on *Villages Dev. Co.* v. *Secretary of the Executive Office of Envtl. Affairs*, 410 Mass. 100 (1991), is unavailing. *Ante* at 683-684. That case did not involve the public trust doctrine or any similar obligation of a State entity to act as a fiduciary on behalf of the people.

[17]The court references the holding of the United States Supreme Court that "control and disposition" of lands beneath the sea "in the first instance are the business of the Federal Government rather than the States," *United States* v. *Maine*, 420 U.S. 515, 522 (1975), and cases cited, and notes that under Federal law the Commonwealth's claim to title to the three mile margin of seabed off its seacoast derives from the Submerged Lands Act, 43 U.S.C. §§ 1301 et seq. (2006). See *ante* at 684 & n.33. The source of the Commonwealth's current authority over Commonwealth tidelands is immaterial to the scope of responsibility that has long been impressed on the Commonwealth under the public trust doctrine to protect the public's rights in those tidelands. See 43 U.S.C. § 1311(a) (States have "title to and ownership of the lands beneath navigable waters within the boundaries of the respective States" and "the right and power to manage, administer, lease, develop, and use" such lands "*in accordance with applicable State law*" [emphasis added]). Cf. *Stop the Beach Renourishment, Inc.* v. *Florida Dep't of Envtl. Protection*, 130 S. Ct. 2592, 2597-2598 (2010) (recognizing Florida's ownership of permanently submerged lands off its coast "in trust for the public").

not at odds. Indeed, they are complementary. Both express the people's paramount interest in the wise and fruitful use of natural resources. Today's opinion, however, casts these two allies in opposition, and exalts regulatory expediency at the cost of fiduciary obligation. By issuing a certificate pursuant to G. L. c. 164, § 69K, which purports to include the "equivalent" of a G. L. c. 91 tidelands license, the siting board has purported to act as the protector of the public's long-standing rights under the public trust doctrine without the necessary express legislative authority to do so. Its usurpation of the Commonwealth's fiduciary responsibility to the people, and DEP's complicit agreement with that usurpation, should not be condoned. Moreover, even if the siting board had the authority to act, it has failed to exercise its role of fiduciary on behalf of the public because it failed to consider the in-State impacts of the wind farm. For these reasons, I respectfully dissent.